UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LASHONDA D. LITTLEFIELD,

                             Plaintiff,

        -against-

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                             Defendant.

15cv9640 (RA) (DF)

**REPORT AND
RECOMMENDATION**

**TO THE HONORABLE RONNIE ABRAMS, U.S.D.J.:**

Plaintiff Lashonda Denise Littlefield ("Plaintiff") seeks review of the final decision of

defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Defendant" or the

"Commissioner"),[1] denying Plaintiff Social Security disability insurance ("SSDI") benefits under

Title II of the Social Security Act (the "Act") on the ground that Plaintiff's impairments did not

constitute a disability for purposes of the Act. Currently before this Court for a report and

recommendation are Plaintiff's motion, pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure, for judgment on the pleadings reversing the Commissioner's decision, or, in the

alternative, remanding for further administrative proceedings (Dkt. 32), and Defendant's

opposition and cross-motion for judgment on the pleadings affirming the Commissioner's

decision (Dkt. 34).

---

[1] Although the caption of this case has not been changed, it is this Court's understanding
that Carolyn W. Colvin no longer holds the position of Acting Commissioner of Social Security,
and that, on January 23, 2017, Nancy Berryhill became Acting Commissioner.

For the reasons set forth below, I respectfully recommend that Plaintiff's motion be granted, the Commissioner's cross-motion be denied, and this matter be remanded for further proceedings.

## **BACKGROUND**[2]

Plaintiff filed an application for SSDI benefits on June 16, 2010. (R. at 104-09.) She alleged disability as of November 28, 2009, due to a herniated disc in her neck, a back injury, a right wrist injury, and an upper right leg injury, all of which she claimed resulted from a motor-vehicle accident. (*Id.* at 117, 394, 399.) After a lengthy procedural history in the Social Security Administration ("SSA") and this Court – including an initial hearing before Administrative Law Judge ("ALJ") Joseph K. Rowe that resulted in a determination adverse to Plaintiff, an appeal by Plaintiff to this Court, and a stipulated remand and a second hearing before the same ALJ – ALJ Rowe issued a second decision on September 3, 2014, again denying Plaintiff's application. (*Id.* at 391-405.) In that second decision, which is now at issue, the ALJ determined that, despite the fact that Plaintiff's impairments were severe, Plaintiff was nonetheless able to perform her past work as a cashier and, therefore, was not disabled for the purposes of the Act. (*Id.* at 404-05.) The decision was affirmed by the Social Security Appeals Council on October 13, 2015, and thereafter became the final decision of the Commissioner. (*Id.* at 384-87.) On December 9, 2015, Plaintiff challenged the Commissioner's denial of benefits,

---

[2] The background facts set forth herein are taken from the Social Security Administration Administrative Record (Dkt. 22) (referred to herein as "R." or the "Record").

within the 60-day limitations period following receipt of the Appeals Council's letter. (*See* Compl., dated Dec. 9, 2015 (Dkt. 1).)

A. **Plaintiff's Personal and Employment History**

Plaintiff was born on June 11, 1976, and was 34 years old at the time that she filed her application. (R. at 113.) Based on her hearing testimony, she lives in New York City, has been married once, and has four children, two of whom live with her. (*Id.* at 421-22.) She completed the 12th grade in 1995. (*Id.* at 118.) As discussed further below, the evidence in the Record reflects that, prior to May 2007, Plaintiff worked as a home health attendant (*see id.* at 118, 422-23), and that she worked as a cashier from May 2007 to June 23, 2008, when she was laid off (*id.* at 117, 118). She has apparently not worked since she was laid off in 2008. (*Id.* at 112.)

As noted above, Plaintiff claims that she became disabled as of November 28, 2009, the date that she was in a motor-vehicle accident. (*Id.* at 290-93.) Plaintiff, who was driving and wearing her seatbelt, was stopped at a light when a cab hit her vehicle head-on, causing the airbags in her vehicle to deploy. (*Id.* at 291.) She was taken by ambulance to the Emergency Department of St. Luke's Roosevelt Hospital in New York City. (*Id.* at 290-93.) At the time she was admitted, Plaintiff complained of pain in her right wrist, right hand, and right groin. (*Id.* at 180, 290-93.) She was released with a prescription for Vicodin with ibuprofen, but returned to the same emergency room the following day, complaining of persistent pain in her right wrist, right groin, right side of her upper back, and left side of her chest, neck, and lower back. (*Id.* at 180, 294-96.) In seeking disability benefits, she claims that, in particular, her neck, back, and wrist pain have persisted since 2009. (*Id.* at 423-24, 426.)

Plaintiff has repeatedly indicated, to examining physicians and to the SSA, that, as a result of her physical limitations, she has had difficulty engaging, without assistance, in certain

life activities, such as cooking, cleaning, doing laundry, and going shopping, and that she has needed help dressing and bathing herself. (*See, e.g.*, *id.* at 128-31, 138, 202, 265-66, 431, 584, 634.) At various points in her written statements and oral testimony, Plaintiff has described her daily activities as including watching television, listening to the radio, reading, socializing with friends, going to her medical appointments, and caring for her two younger children with help from her older children, who do not live with her. (*Id.* at 132, 138, 180, 265-66, 425, 584.)

**B.** **Evidence of Plaintiff's Impairments for the First 12 Months**
**Following the Alleged November 28, 2009 Onset of her Disability**

**1.** **Treatment by Physical Medicine and**
**Rehabilitation Specialist (Dr. Drukman) and Other**
**Providers, Prior To Plaintiff's Application for Benefits**

Within a week of the date of her November 2009 accident, Plaintiff began treatment with Dorina Drukman, D.O., a specialist in physical medicine and rehabilitation,[3] at Grand Central Physical Medicine and Rehabilitation in New York City. (*See* Plaintiff Lashonda D. Littlefield's Brief in Support of Motion for Judgment on the Pleadings, dated Oct. 21, 2016 ("Pl. Mem.") (Dkt. 33), Ex. A.) Plaintiff proceeded to see Dr. Drukman fairly regularly for a period of about six-and-a-half months, and, as noted below, followed Dr. Drukman's referrals for both wrist surgery (performed by Salvatore Lenzo, M.D.) and a consultation with a back surgeon (Jason M. Gallina, M.D.). The Record contains several reports generated by Dr. Drukman in connection with Plaintiff's repeated visits during this period of her treatment, as well as a number of medical test results, as follows.

---

[3] "Physical medicine and rehabilitation (PM&R), also known as physiatry or rehabilitation medicine, aims to enhance and restore functional ability and quality of life to those with physical impairments or disabilities affecting the brain, spinal cord, nerves, bones, joints, ligaments, muscles, and tendons." (http://www.aapmr.org/about-physiatry/about-physical-medicine-rehabilitation.)

In her initial medical evaluation on December 3, 2009, Dr. Drukman noted that Plaintiff was experiencing pain in her neck, lower back, right wrist, and right groin after the motor vehicle accident.  (R. at 180.)  Plaintiff reportedly had difficulty sitting for longer than 30 minutes at a time, standing for longer than 10 to 15 minutes at a time, walking, lifting her right arm, and doing household chores.  (*Id.*)  Dr. Drukman also noted that Plaintiff received help with household chores from her mother, neighbors, and children.  (*Id.*)

Dr. Drukman recorded Plaintiff's then-current complaints as neck pain, worse on the right side; tingling in the right hand; pain and swelling in the right wrist; lower back pain, worse on the right side; and pain in the right hip.  (*Id.*)  Dr. Drukman noted that Plaintiff was taking 600mg of Motrin about four times a day, "but without significant relief of pain."  (*Id.*)

Upon physical examination, Dr. Drukman noted that Plaintiff had decreased grip strength in her right hand (10 pounds in the right hand; 60 pounds in the left, unaffected hand) and decreased strength in her right wrist flexion.  (*Id.* at 181, 183.)  Plaintiff's gait was found to be "abnormal," and "slow and cautious," with guarding of the upper and lower trunk.  (*Id.* at 184.)  Dr. Drukman's diagnostic impressions were cervical radiculitis, lower back pain, pain in the pelvic region, sprain/strain in the right hip, pain in the right hand, effusion in the right wrist and hand, sprain/strain in the right hand, numbness in the right hand, and contusion of the chest.  (*Id.*)

Dr. Drukman's treatment plan comprised a course of physical therapy three times per week for four weeks,[4] a lumbar elastic corset, and Kinesio taping for the right wrist.  (*Id.*)  She

---

[4] The Record shows that Plaintiff then, in fact, underwent a substantial course of physical therapy, attending sessions at Grand Central Physical Medicine and Rehabilitation three times a week from December 3, 2009 through June 24, 2010.  (*Id.* at 220-56.)

prescribed one Tylenol No. 3[5] tablet every six hours and 600mg of Motrin three times a day. (*Id.* at 185.) Noting that "[Plaintiff] demonstrate[d] marked partial disability with limitations in frequent reaching, grabbing with the right arm, frequent twisting, prolonged standing, sitting and walking," Dr. Drukman's recorded Plaintiff's prognosis as "[g]uarded." (*Id.*)

### b. <u>Wrist X-Ray (December 22, 2009)</u>

On December 22, 2009, Plaintiff's right wrist and right hand were X-rayed and analyzed by Dr. Joseph Tuvia, M.D. (*Id.* at 212-13.) Frontal, oblique, and lateral views were obtained of the right hand. (*Id.* at 212.) The osseous structures of the right hand were intact, with no fracture or dislocation. (*Id.*) There were no degenerative changes, soft tissue abnormalities, or calcifications in the right hand. (*Id.*) Frontal, oblique, and lateral views of the right wrist were obtained. (*Id.* at 213.) The osseous structures of the right wrist were intact, with no fracture or dislocation. (*Id.*) The scaphoid was unusually elongated, articulating predominantly with the trapezium, displacing the trapezoid medially. (*Id.*) The remaining osseous structures of the right wrist were normally aligned. (*Id.*) There were no soft tissue abnormalities, degenerative changes, or calcifications in the right wrist. (*Id.*)

### c. <u>Visit With Dr. Drukman (January 13, 2010)</u>

On a follow-up visit on January 13, 2010, Dr. Drukman noted that Plaintiff was admitting a 40-45 percent decrease in pain severity and increased mobility and range of motion with treatment. (*Id.* at 186.) At that time, Plaintiff was taking 600mg of Motrin on an as-needed basis, usually in the second half of the day, and had significantly decreased her intake of nonsteroidal anti-inflammatory drugs since starting physical therapy. (*Id.*)

---

[5] Tylenol No. 3 is a narcotic painkiller consisting of acetaminophen and codeine. (*Acetaminophen and Codeine Overdose*, https://medlineplus.gov/ency/article/002562.htm.)

On physical examination, Dr. Drukman noted that there was still mild swelling in Plaintiff's right ulnar wrist and that she had decreased right hand grip strength (40 pounds on the right, 65 pounds on the left (*id.* at 189)), due to pain. (*Id.* at 186-87.) Dr. Drukman made notes of mild effusion/swelling in the right ulnar wrist; moderate tenderness in the right cervical paraspinals, specifically in the areas over the lower cervical spinous processes, as well as moderate tenderness over the right ulnar wrist and in the lumbar paraspinals on the right side; and weakness in right hand flexion, fifth finger abduction on the right hand, and lumbar extension. (*Id.* at 186-87.) She noted that Plaintiff's gait was "[i]mproved," but that there was "still some guarding in the upper and lower trunk." (*Id.* at 189.)

Dr. Drukman prescribed MRI studies of the cervical spine, right wrist, and lumbar spine. (*Id.*) As to work status, Dr. Drukman noted that "[Plaintiff] [was] partially disabled," and that "[h]er limitations [were] frequent repetitive forceful range of motion with the right wrist, frequent twisting, prolonged standing, prolonged sitting[,] and frequent bending." (*Id.* at 190.) Dr. Drukman's reported prognosis was still "[g]uarded." (*Id.*)

### d. MRIs of Plaintiff's Spine and Wrist (January 18 and 19, 2010)

On January 18, 2010, Plaintiff had MRIs of her cervical spine and lumbar spine. (*Id.* at 207-09.) Radiologist Mark Shapiro, M.D., analyzed the MRIs. On Plaintiff's lumbar spine, there was a broad-based disc bulge at L4-L5, with extension of the disc into the neural foramen bilaterally. (*Id.* at 207.) There was loss of signal and central herniation at L5-S1, creating impingement on the neural canal. (*Id.*) As to Plaintiff's cervical spine, there was straightening of the cervical lordosis. (*Id.* at 208.) There was focal central herniation at C6-C7, creating impingement on the neural canal. (*Id.*)

On January 19, 2010, Plaintiff had an MRI of her right wrist. (*Id.* at 209.) There was irregularity of the scapholunate ligament, consistent with a partial tear. (*Id.*) There was fluid in the distal radioulnar joint, and an underlying perforation of the triangular fibrocartilage could not be excluded. (*Id.*) There was fluid adjacent to the distal ulna, which was nonspecific; a ganglion cyst could not be excluded. (*Id.*)

### e. Visit With Dr. Drukman (February 24, 2010)

On February 24, 2010, Dr. Drukman saw Plaintiff again and noted that she had undergone surgery on her right wrist on February 8, 2010. (*Id.* at 192.) The Record separately reflects that this surgery was performed by Dr. Lenzo, an orthopedic surgeon at New York University's Hospital for Joint Diseases. (*See id.* at 318-19.) Dr. Lenzo repaired a tear in the triangular fibrocartilage complex in Plaintiff's right wrist, and a partial tear of the scaphoid interosseous ligament with associated synovitis. (*Id.* at 318.)

Dr. Drukman wrote that Plaintiff "continue[d] to experience pain and stiffness interfering with her daily activities in her upper back, lower back[,] and right wrist." (*Id.* at 192.) At that point, Plaintiff was taking extra-strength Vicodin once daily and Motrin as needed. (*Id.*) Dr. Drukman also reviewed the results of MRIs of Plaintiff's cervical spine, lumbar spine, and right wrist, taken on January 18 and 19, 2010. (*Id.*)

Dr. Drukman noted that Plaintiff had moderate swelling in her right dorsal hand, decreased right hand grip due to pain (20 pounds in the right; 65 in the left (*id.* at 195)), and decreased right wrist flexion and extension. (*Id.* at 193.) Plaintiff was found to have effusion/swelling in the right dorsal hand; moderate tenderness in the right dorsal wrist and hand; tenderness in the right cervical paraspinals; tenderness in the lumbar paraspinals bilaterally; weakness in right wrist flexion, extension, and radial deviation; and weakness with lumbar

flexion and extension. (*Id.*) Her gait was "[i]mproved with some guarding in the upper and lower trunk." (*Id.* at 195.)

Dr. Drukman indicated that Plaintiff was to begin postoperative physical therapy for the right wrist, and to continue physical therapy for the cervical and lumbar spine, three times per week, for four to six weeks. (*Id.* at 196.)[6] She also recorded that Plaintiff planned to consult with a spinal orthopedic surgeon "due to persistence of her cervical and lumbar symptoms and positive findings on the MRIs," and "for possible epidural steroid injection or any other necessary treatment plan modifications." (*Id.*)[7] Dr. Drukman wrote that "[Plaintiff] [was] temporar[il]y totally disabled" (*id.*), and again stated that Plaintiff's prognosis was "[g]uarded" (*id.*).

### f.      Spinal X-Rays (March 12, 2010)

On March 12, 2010, following a referral by Dr. Gallina, Plaintiff underwent X-rays of her cervical and lumbosacral spine. Both X-ray reports were analyzed by Jeffrey Goldman, M.D. (*Id.* at 303, 304.)

---

[6] The Record shows that Plaintiff went to a follow-up appointment with the wrist surgeon, Dr. Lenzo, on April 2, 2010 (*id.* at 197), and that, at that time, Dr. Lenzo recommended that Plaintiff continue strengthening her right wrist for six weeks (*id.*).

[7] On March 3, 2010, Plaintiff in fact consulted with Dr. Gallina, a spinal orthopedic surgeon. (*Id.* at 374-75.) On physical examination, Dr. Gallina found that Plaintiff had pain with forward flexion, and no pain with extension. (*Id.* at 374.) Plaintiff was found to have tenderness to palpation of her neck paraspinal muscles (*id.*), and an MRI of Plaintiff's lumbar spine was found to show degenerative disc disease at L5-S1, with small central herniation (*id.* at 374-75). Dr. Gallina recommended that Plaintiff continue physical therapy over the following weeks, and noted that Plaintiff was a candidate for certain surgeries. (*Id.* at 375.) Dr. Gallina did not, however, recommend epidural steroid injections for Plaintiff's back pain, as he believed epidural steroid injections tended to work better for leg radiculopathy secondary to nerve compression than for axial back pain from degenerative disc disease. (*Id.*)

As to the X-ray of Plaintiff's cervical spine, Dr. Goldman noted Plaintiff's history of herniated disc and right-sided neck pain. (*Id.* at 303.) He found the height and alignment of the vertebral bodies and cervical spine were normal (*id.*), and observed no spondylolisthesis or compression deformity (*id.*). He did find, though, that the X-ray revealed mild grade 1 retrolisthesis of C4 on C5, which reduced with extension. (*Id.*) He noted that the soft tissues were unremarkable, and that there was no significant disc space narrowing, endplate sclerosis, or osteophyte formation. (*Id.*) Dr. Goldman concluded that Plaintiff had mild retrolisthesis of C4 on C5,[8] which reduced with extension. (*Id.*)

As to Plaintiff's lumbosacral spine, Dr. Goldman noted Plaintiff's history of back pain and herniated disc. (*Id.* at 304.) Based on his review of X-rays of both flexion and extension views, he found that the height and alignment of the vertebral bodies and thoracic spine were normal. (*Id.*) He also found no spondylolisthesis or compression deformity. (*Id.*) He did, however, observe "[v]ery mild" disc space narrowing at L5-S1. (*Id.*) He found no instability with flexion or extension, and noted that Plaintiff's pelvic bones were unremarkable. (*Id.*) Dr. Goldman concluded that Plaintiff had mild degenerative disc disease at L5-S1. (*Id.*)

g.      **Visit With Dr. Drukman (May 3, 2010)**

On a follow-up visit from Plaintiff on May 3, 2010, Dr. Drukman noted that Plaintiff "admit[ted] [a] good response to the surgical intervention [on her right wrist] and subsequent physical therapy." (*Id.* at 197.) At that time, Plaintiff reportedly stated that the pain in her right wrist was "significantly less severe and [was] localized to the dorsal wrist." (*Id.*) Dr. Drukman wrote, however, that Plaintiff's lower back pain was "still a problem, interfering with positioning

_____

[8] While Dr. Goldman's notes indicate mild retrolisthesis of "L4 on L5" (R. at 303), this Court assumes that this was in error, as it does not match the X-ray report itself.

in the bed at night." (*Id.*) Dr. Drukman further reported that Plaintiff continued to complain of neck pain, right wrist pain, and lower back pain, and that she was taking over-the-counter pain medication (Tylenol Extra Strength), although she had discontinued Vicodin. (*Id.*)

Dr. Drukman noted Plaintiff's March 3, 2010 consultation with orthopedic surgeon Dr. Gallina (*see supra*, at n.7), and the fact that Dr. Gallina had recommended that Plaintiff continue physical therapy, but not have epidural steroid injections. (*Id.*) Dr. Drukman also noted that the swelling in Plaintiff's right dorsal hand had subsided. (*Id.* at 198.) While Plaintiff's right-hand grip strength was found to be "[r]elatively decreased" (right hand, 35 pounds; left, 60 pounds (*id.* at 200)), Plaintiff's strength in right wrist flexion and extension had improved. (*Id.* at 198.) Tenderness was found to be less severe in Plaintiff's right dorsal wrist, although tenderness persisted in her right lumbar paraspinals. (*Id.*) Plaintiff's weakness in the lumbar extension was also found to be less severe, although lumbar flexion weakness persisted. (*Id.*) Plaintiff's gait was found to be "[i]mproved[,] with some guarding in the lower trunk." (*Id.* at 200.)

As to work status, Dr. Drukman again noted that Plaintiff "[was] temporar[il]y totally disabled" (*id.* at 201), and again indicated that her prognosis was "[g]uarded." (*Id.*)

### h. Visit With Dr. Drukman (June 7, 2010)

On June 7, 2010, Dr. Drukman saw Plaintiff again and noted that she admitted a good response to physical therapy, with decreased pain in her right wrist, although she was still reportedly experiencing difficulties with household activities, such as cooking and cutting vegetables. (*Id.* at 202.) Dr. Drukman noted that Plaintiff had help from family members with the laundry and shopping, but that cooking was still Plaintiff's "responsibility" and "it [was] difficult for her." (*Id.*)

As to Plaintiff's back pain, Dr. Drukman referred to Plaintiff's consultation with Dr. Gallina (*id.*), and noted that Plaintiff continued to experience lower back pain when she climbed stairs, sat, walked for more than five to 10 minutes, and stood for longer than 10 minutes. (*Id.*) Plaintiff apparently reported that she had difficulty sitting without back support and needed to lie down a few times a day to alleviate her back discomfort. (*Id.*) Plaintiff also indicated that she was uncomfortable at night, and that her lower back pain was worse when she lay on her right side or was supine. (*Id.*) Dr. Drukman noted that Plaintiff was taking over-the-counter Tylenol Extra Strength three to four times per week, as well as Motrin three to four times per week, and that she "appear[ed] concerned and upset with her persistent lower back symptoms." (*Id.*)

On physical examination, Plaintiff was found to have decreased right wrist flexion. (*Id.* at 203.) Plaintiff's tenderness was determined to be less severe in the right dorsal wrist, less severe in the right cervical paraspinals, but worse in the right lumbar paraspinals. (*Id.*) Plaintiff had relative weakness in her right wrist flexion, and in lumbar extension and flexion. (*Id.*) Her grip strength was found to be 60 pounds in the right hand and 65 pounds in the left. (*Id.* at 205.) As in her previous notes, Dr. Drukman indicated that Plaintiff's gait was "[i]mproved[,] with some guarding in the lower trunk." (*Id.*) Dr. Drukman also again wrote that Plaintiff was "temporarily totally disabled," this time adding that Plaintiff was "unable to perform her work as a cashier[,] which require[d] prolonged standing, frequent twisting, bending, and reaching." (*Id.* at 206.) Dr. Drukman again recorded Plaintiff's prognosis as "[g]uarded." (*Id.*)

### i.     <u>Wrist Electrodiagnostic Studies (June 11, 2010)</u>

In an undated report, Dr. Drukman summarized the results of electromyogram ("EMG") and nerve conduction velocity ("NCV") electrodiagnostic studies on Plaintiff's wrists on

June 11, 2010. (*Id.* at 215-19.) According to Dr. Drukman, the EMG study did not show evidence of radiculopathy (*id.* at 217), and the NCV study did not show evidence of ulnar or median neuropathy on Plaintiff's right wrist (*id.*).

In light of the EMG/NCV test results, Dr. Drukman recommended that Plaintiff continue physical therapy and rehabilitative care. (*Id.*) Dr. Drukman noted that Plaintiff was advised to use a right wrist splint at night "for more physiological positioning." (*Id.*) The Record, however, does not reflect that Plaintiff continued to follow up with Dr. Drukman after this time, seemingly because she lost her insurance coverage.[9]

### 2. Plaintiff's Statements Regarding Her Impairments, Made in Connection with Her June 16, 2010 SSDI Application

Plaintiff filed an application for SSDI benefits on June 16, 2010 (*id.* at 104-09), and the Record includes a Disability Report, which, while undated, was apparently filled out by Plaintiff at that time (*id.* at 116-25).[10] In that report, Plaintiff listed her conditions limiting her ability to work as "[h]erniated disc in neck," "injury to back," "injury to right wrist," and "injury to upper right leg." (*Id.* at 117.) Under "Medications," Plaintiff indicated that she took hydrocodone with APAP[11] and ibuprofen. (*Id.* at 120.)

---

[9] At several points in the Record, there are references to Plaintiff's no-fault insurance having expired, after having covered her six-plus months of treatment with Dr. Drukman, and, presumably, her wrist surgery and physical therapy. For example, at the outset of Plaintiff's first administrative hearing before the ALJ, Plaintiff's attorney stated that Plaintiff's "no-fault was cut off." (*Id.* at 38; *see also id.* at 437 (Plaintiff explaining, at the second hearing, that she was not able to continue treatment when the "no-fault insurance that was provided from the car accident ran out").)

[10] In a later disability report completed by Plaintiff, she states the date of her last such report was June 16, 2010 (*see id.* at 146), supporting the inference that her initial disability report was filled out at that time.

[11] Hydrocodone is a narcotic painkiller. (*Hydrocodone Combination Products*, https://medlineplus.gov/druginfo/meds/a601006.html.) APAP is another name for over-the-

On June 24, 2010, the New York State Office of Temporary and Disability Assistance, Division of Disability Determinations ("Division of Disability Determinations"), requested that Plaintiff complete a questionnaire regarding her disability. (*Id.* at 127-43.) Plaintiff completed the questionnaire on June 29, 2010. (*Id.* at 143.) In the questionnaire, Plaintiff described her daily activities as taking a shower, handling her "daily personal care," preparing meals for herself and her children, undertaking physical therapy, "try[ing] to manage with the pain [she] sometime[s] experience[d]," and taking care of her younger daughter with the assistance of her two older children. (*Id.* at 128, 129.) Her listed hobbies were making chocolate, reading, watching television, and cooking (*id.* at 132), although Plaintiff wrote that she did not engage in these activities as often as she would like. (*Id.*)

Plaintiff also stated, in the questionnaire, that she was responsible for the care of her children. (*Id.* at 128.) She additionally stated, however, that her children bought and prepared meals, and helped with the laundry, housework, and shopping. (*Id.*) Plaintiff indicated that, since the onset of her disability, she could no longer do laundry, go shopping, do household work, go for long walks, stand, climb, lift, or sit for long periods of time. (*Id.* at 128, 131, 133.) She also noted she no longer had use of her right hand, and that she had a difficult time sleeping due to pain. (*Id.* at 128.) She further noted that she had difficulty getting dressed and needed someone else to iron her clothes, that she was unable to take a bath because she had a difficult time getting in and out of the bathtub, and that she could not stand up for too long in the shower. (*Id.*) Plaintiff indicated that someone else cared for her hair and shaving, although she fed herself and used the toilet herself. (*Id.* at 130.)

---

counter painkiller acetaminophen. (*Acetaminophen*, https://medlineplus.gov/druginfo/meds/a681004.html.)

Plaintiff also wrote, in the questionnaire, that, since the motor-vehicle accident in which she was injured, she needed help with, and sometimes needed to take breaks while, preparing meals.  (*Id.*)  Plaintiff wrote that she tried to prepare meals that took as little time as possible.  (*Id.*)  She stated that her partner, daughter, mother, mother's friend, son, and restaurants prepared her meals, when she was unable to do so herself.  (*Id.*)  Plaintiff stated that she did not cook as often as she did before the motor vehicle accident.  (*Id.*)  While she indicated that she went outside five days a week, she also noted that, if she had a lot of pain, she would not go outside at all.  (*Id.* at 131.)  She indicated that she could walk, drive a car, ride in a car, and use public transportation, and that she was able to go out alone.  (*Id.*)  Plaintiff stated that she went shopping in stores for groceries, household products, and hygiene products, and that she shopped approximately eight times a month, for about 15 to 20 minutes at a time.  (*Id.* at 132.)

Plaintiff described her pain as a "[v]ery strong ache" on the right side of her neck, in her upper right leg, right wrist, and lower back on the right side.  (*Id.* at 136, 137.)  Plaintiff also described the pain in her right wrist as radiating down to her fingers.  (*Id.* at 136.)

### 3.    Field Office Report of the SSA's Division of Disability Determinations (June 16, 2010)

A June 16, 2010 Field Office Disability Report[12] regarding Plaintiff indicates that Plaintiff had difficulty sitting and writing.  (*Id.* at 114.)  The interviewer who completed the form noted that "[Plaintiff] had to shift her sitting position several times during [the] interview," that she "appeared to be in discomfort due to her injuries," and that she "also had difficulty signing her name [because] of [the] injury to her right wrist."  (*Id.*)

---

[12] A second, undated Field Office Disability Report is also included in the Record, but contains no substantive information.  (R. at 144-45.)

### 4.    Evaluation by SSA Consulting Physician Dr. Eyassu (August 3, 2010)

After the SSA received Plaintiff's application, its Division of Disability Determinations referred Plaintiff to Rahel Eyassu, M.D., of Industrial Medicine Associates, P.C., for a consultative examination.  (*Id.* at 265-68.)  Plaintiff saw Dr. Eyassu on August 3, 2010, and complained to him of right upper thigh pain, which she described as sharp, and sharp lower back and neck pain.  (*Id.* at 265.)  Plaintiff's pain was reportedly exacerbated by sitting, standing, or walking "for too long."  (*Id.*)  Plaintiff told Dr. Eyassu that she had no numbness and no tingling sensation.  (*Id.*)  She rated her pain as eight out of 10 on a 10-point scale, and said that physical therapy and Tylenol with codeine temporarily relieved her pain.  (*Id.*)  Dr. Eyassu recorded Plaintiff's medications as hydrocodone with APAP as needed, ibuprofen as needed, and Tylenol No. 3 as needed.  (*Id.*)

Plaintiff reportedly told Dr. Eyassu that, due to her pain, she did not do any cooking, cleaning, laundry, or shopping (*id.*), but that she showered and dressed herself (*id.*).  She reported that her activities mainly included watching television, listening to the radio, reading, and socializing with friends.  (*Id.* at 265-66.)

Plaintiff's gait was found to be slow, and she was observed to have slight difficulty walking on heels and toes.  (*Id.* at 266.)  Dr. Eyassu also found that Plaintiff's squat was 40 percent of full and that her stance was normal.  (*Id.*)  Plaintiff used no assistive devices, was apparently able to change for the exam and to get on and off the exam table without help, and was able to rise from a chair without difficulty.  (*Id.*)

Plaintiff's cervical spine flexion-extension was found to be 30 degrees, rotation right and left 60 degrees, and lateral flexion 30 degrees.  (*Id.* at 267.)  Plaintiff was not found to have any paraspinal tenderness.  (*Id.*)  Her lumbar spine forward flexion was recorded as 0-50 degrees,

extension 0-20 degrees, and lateral and rotary movements 0-20 degrees.[13]  (*Id.*)  Straight leg

raising was recorded as negative bilaterally.  (*Id.*)  Full range of motion was noted in the right

wrist.  (*Id.*)  Plaintiff's joints were said to be stable and nontender.  (*Id.*)  Plaintiff's hand and

finger dexterity were found to be intact, with bilateral grip strength of four out of five.  (*Id.*)

        Dr. Eyassu listed the following diagnoses for Plaintiff:

      1.      Status post right wrist ligament repair.
      2.      Low back pain with lumbar spine derangement.
      3.      Neck pain with cervical spine derangement.
      4.      Right leg pain.

(*Id.*)  Dr. Eyassu stated Plaintiff's prognosis to be "fair with continued conservative treatment."

(*Id.*)

        As his "medical source statement," Dr. Eyassu wrote that Plaintiff had limitations that

were "moderate on activity that would require repetitive bending, excessive neck movement,

turning and twisting."  (*Id.* at 267-68.)  Dr. Eyassu also indicated that Plaintiff should "[a]void

heavy lifting and sustained pulling and pushing," and noted Plaintiff had "[s]ome limitation in

gripping and grasping with the right hand."  (*Id.* at 268.)

     **5.**     **Residual Functional Capacity ("RFC") Assessment**
           **by Disability Analyst N. Danielson (September 7, 2010)**

        On September 7, 2010, disability analyst N. Danielson ("Danielson") completed a

physical RFC assessment of Plaintiff.  (*Id.* at 270-75.)  According to Danielson, Plaintiff could

occasionally lift and/or carry 20 pounds, and frequently lift and/or carry 10 pounds.  (*Id.* at 271.)

Danielson determined that Plaintiff was able to stand and/or walk, with normal breaks, for a total

of six hours in an eight-hour workday, and that Plaintiff could also sit, with normal breaks, for a

---

[13] Plaintiff notes that "[b]ecause Dr. Eyassu provided a range of motion rather than specific figures" upon examination of Plaintiff's lumbar spine, "it is difficult to assess the extent to which [Plaintiff's] lumbar range of motion was diminished."  (Pl. Mem., at 21.)

total of six hours in an eight-hour workday. (*Id.*) Danielson further determined that Plaintiff's ability to push and pull was unlimited. (*Id.*)

Danielson noted that Plaintiff "appear[ed] to be in no acute distress." (*Id.*) The assessment reported that Plaintiff's gait was slow, that she had slight difficulty walking on heels and toes, that her squat was 40 percent of full, and that her stance was normal. (*Id.*) Danielson found that Plaintiff used no assistive devices, that she needed no help getting on and off the examination table, and that she was able to rise from a chair without difficulty. (*Id.*) Plaintiff's cervical spine flexion-extension was found to be 30 degrees; rotation right and left was found to be 60 degrees; and lateral flexion was found to be 30 degrees. (*Id.*) Plaintiff reportedly had no paraspinal tenderness. (*Id.*) Her lumbar spine forward flexion was reported as 0-50 degrees, extension as 0-20 degrees, and lateral and rotary movements as 0-20 degrees. (*Id.*) A test for straight leg raising was reportedly negative bilaterally. (*Id.*) Danielson noted the results of Plaintiff's cervical spine X-ray, which showed mild retrolisthesis at C4 and C5,[14] resulting in reduced extension. (*Id.*) Danielson also noted that Plaintiff's lumbar spine X-ray showed mild degenerative disc disease at L5-S1. (*Id.*) Danielson noted that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (*Id.* at 272-73.)

According to Danielson, Plaintiff reported that she had been involved in a motor-vehicle accident in 2009 that resulted in injuries to her right wrist, lower back, and neck. (*Id.* at 273.) Danielson also noted that Plaintiff complained of sharp pain in her right upper thigh, as well as sharp lower back and neck pain, and that her pain was exacerbated by sitting. (*Id.*)

---

[14] Danielson reproduced a typographical error from Dr. Goldman's analysis of Plaintiff's cervical spine X-ray, which indicated mild retrolisthesis of "L4 on L5" in the original (R. at 303), but which this Court assumes should read "C4 on C5" (*see supra*, at Section B(1)(f) and n.8).

Danielson assessed Plaintiff as having moderate limitations in activities that would require repetitive bending, excessive neck movement, turning, and twisting. (*Id.* at 274.) It was recommended that Plaintiff avoid heavy lifting and sustained pulling and pushing. (*Id.*) Danielson also assessed Plaintiff as having some limitation in gripping and grasping with the right hand. (*Id.*) Danielson noted that the conclusions that had been made by Plaintiff's examining source (*i.e.*, Dr. Eyassu) regarding her limitations were not significantly different from those stated in Danielson's assessment. (*Id.*)

### 6. Examination by Pain Management Specialist Dr. Nesen (October 11, 2010)

Dmitry K. Nesen, M.D., is a pain management specialist who examined Plaintiff on October 11, 2010. (*Id.* at 381-83.) In an Initial Pain Management Medical Report, Dr. Nesen indicated that Plaintiff's physiatrist (*i.e.*, Dr. Drukman) had started Plaintiff on a treatment course involving physical therapy, anti-inflammatory medications, muscle relaxants, and painkillers to address Plaintiff's right-sided neck and lower back pain. (*Id.* at 381.) According to Dr. Nesen, though, conservative treatment had resulted in "only partial improvement" of Plaintiff's condition. (*Id.*) Dr. Nesen noted that Plaintiff's January 18, 2010 MRI study of the lumbosacral spine showed L4-L5 disc bulging, and L5-S1 disc herniation with associated facet arthropathy. (*Id.*) He wrote that Plaintiff complained of persisting right-sided lower back pain, occurring daily with periodic worsening, and aggravated by daily activities including prolonged standing, bending, or walking. (*Id.*) He also wrote that Plaintiff's pain did not radiate to her lower extremities, nor was there associated numbness in Plaintiff's lower extremities. (*Id.*) Plaintiff's right-sided neck pain presented primarily with muscle spasms, which, according to Dr. Nesen's report, occurred periodically and without radiation to the upper extremities. (*Id.*)

Dr. Nesen recorded Plaintiff's medications as: Tylenol No. 3 (as needed for pain), and a muscle relaxant, the "name of which [Plaintiff did] not remember." (*Id.* at 382.)

Upon Dr. Nesen's physical examination of Plaintiff's back, her lumbosacral spine presented with a decreased range of motion in extension space, more than flexion. (*Id.*) A straight leg raise test was negative bilaterally. (*Id.*) A lumbosacral facet loading test was positive on the right. (*Id.*) On palpation, Plaintiff presented with paravertebral muscle spasms on the right, and she had pain on compression of the lower right lumbosacral facet joints. (*Id.*) Plaintiff's strength was mildly decreased in the right lower extremity, primarily in the right hip flexor muscles. (*Id.*) Dr. Nesen's examination of the cervical spine revealed a "decreased range of motion to the right lateral flexion and rotation." (*Id.*) A cervical facet loading test was negative bilaterally. (*Id.*) Dr. Nesen noted that Plaintiff had paravertebral cervical and trapezial muscle spasms on the right side. (*Id.*) Plaintiff had mild pain on compression of the right lower cervical facet joints. (*Id.*) Her muscle strength was found to be five out of five in the upper extremities. (*Id.*)

Dr. Nesen assessed Plaintiff with right lumbosacral facet arthropathy with persisting post-traumatic myofascial lower back pain, and with right cervical myofascial pain, post-traumatic, "possibly due to right cervical facet arthropathy." (*Id.* at 383.) Dr. Nesen advised Plaintiff to continue her conservative treatment plan, involving medications and physical therapy. (*Id.*) Dr. Nesen also recommended injection therapy in the form of right L3-L4 through L5-S1 facet joint medial branch nerve blocks, under X-ray guidance, as a diagnostic and possibly therapeutic tool. (*Id.*) Dr. Nesen wrote that Plaintiff would "think about this option of treatment" and would follow up with him with "[a] decision regarding this treatment at a later date." (*Id.*)

## 7.    Further Statements by Plaintiff to the SSA

On or about December 9, 2011, after her initial claim for SSDI was denied, Plaintiff submitted an undated Disability Report – Appeal form.  (*Id.* at 146-50; *see also id.* at 163-68 (showing date when Plaintiff sought review by the SSA Appeals Council).)  In that form, Plaintiff noted that there had been no change in her condition for better or worse since she had last completed a Disability Report, presumably in June of 2010.  (*Id.* at 146.)  Plaintiff also indicated that, at that time, she was not taking take any prescription or non-prescription medications for her condition.  (*Id.* at 148.)  Plaintiff wrote that her daughter helped her with her "personal needs," and that she had "many limitations" as a result of her condition.  (*Id.* at 149.)

### C.    Evidence of Plaintiff's Impairments After the First 12 Months of Her Claimed Disability

The medical evidence in the Record relating to the extent of Plaintiff's impairments after the first year of her claimed disability is considerably more sparse.  The Record contains no evidence *at all* for the 10 months following Plaintiff's October 11, 2010 visit to Dr. Nesen. Essentially, from that point forward, the medical evidence consists only of:  (1) records of the William F. Ryan Community Health Center ("Ryan Center"), a clinic where Plaintiff evidently sought treatment on three occasions, in July, August, and November 2011; (2) the report of a second SSA consulting physician, Vinod Thukral, M.D., who examined Plaintiff on May 27, 2014; and (3) a final report from Dr. Drukman, dated June 29, 2014 – although, with one exception of little relevance, the Record does not reflect that Plaintiff had seen Dr. Drukman at any time during the four years from June 2010 to June 2014.[15]  The Record also contains

---

[15] On June 7, 2012, when pregnant, Plaintiff saw Dr. Drukman after falling from her chair at a restaurant and injuring her hip and ankle.  The injuries Plaintiff sustained as a result of the fall are not relevant to Plaintiff's application for SSDI benefits, as they are not related to her

Plaintiff's testimony about her own impairments, given at the first hearing before the ALJ on

August 3, 2011, and at the second hearing, held on July 24, 2014. Some of this evidence

described Plaintiff's condition past the date when she was last eligible for SSDI (December 31,

2013), so is of particularly limited usefulness. In order, the remaining medical and testimonial

evidence may be summarized as follows.

     **1.**       **Evidence of Plaintiff's Condition Prior to**
                 **Her Date Last Insured (December 31, 2013)**

        **a.**       **Plaintiff's Testimony Before the ALJ**
                   **at the First Hearing (August 3, 2011)**

On August 3, 2011, Plaintiff testified before the ALJ, represented by the same attorney,

Robert Brigantic, Esq. ("Brigantic"), who is representing her in this action. (*See id.* at 36.) She

testified that she had worked doing "home healthcare" from 1997 to 2007, and then as a cashier

until 2008, when she was laid off. (*Id.* at 42-43.) She stated that she could not perform her past

job as a cashier because she was "unable to stand, sit for a long period of time, or walk." (*Id.* at

44.)

Plaintiff specifically testified to pain in her neck, her lower right back, her right wrist, and

her right upper leg. (*Id.* at 45.) With respect to the treatment she had received for her pain, she

testified that she had received physical therapy three times a week, from December 3, 2009 to

June of 2010; that she had been prescribed medication (which helped "[a] little"); and that she

wore a back brace (which also "alleviate[d] a little bit of the pain"). (*Id.* at 46-48.) She also

testified that she was currently receiving pain medication from Dr. Yonhee Cha, an internist at

the Ryan Center. (*See id.* at 48-49; *see also* Section (b) *infra,* and n.16.) From statements made

---

alleged disabling conditions, but Dr. Drukman's June 7, 2012 report does indicate that Plaintiff
had persistent back pain on the right side. (*Id.* at 619.)

to the ALJ by her counsel, it appears that Plaintiff had just been able to begin treating at the Ryan Center because she had begun receiving Medicaid. (*See id*. at 38.)

As to her limitations, Plaintiff testified that she was right-handed (*id*. at 50), and that she could not use her right hand to write, grasp, or pick up objects (*id*. at 52; *see also id*. at 50 (testifying that she used her left hand to lift a cup to her mouth to drink)). When the ALJ asked her if she could "put [her] arms out, make fists, [and] manipulate [her] fingers," she responded, "No. It's like it's numb, like I don't feel any sensation sometimes." (*Id*. at 50.) She also testified that her daughter helped her to dress herself. (*Id*.) She further testified that she could only sit, without experiencing "a lot of pain" in her back, for "[m]aybe like 10 or 15 minutes" (*id*. at 51), that she could only stand for about that same amount of time (*id.*), and that she could walk about four or five blocks (*id.* at 52). She testified that she could not bend to pick up a piece of paper from the floor, that she could lift about five pounds, and that she could not push or pull a shopping cart. (*Id.*)

In response to questioning by her attorney, Brigantic, Plaintiff testified that her prior work as a cashier had required her to carry "daily supplies [and] merchandise," as well as frequently to lift and carry about 10 to 20 pounds of "inventory." (*Id*. at 52-53.)

### b. Medical Evidence from Treating Internist Dr. Cha (August 18 and November 18, 2011)

Starting in or about July 2011, just prior to her August 3 testimony before the ALJ, Plaintiff began to visit the Ryan Center.[16] Based on the medical records before the Court, it

---

[16] As noted above, at the first hearing before the ALJ, conducted on August 3, 2011, Plaintiff testified that Dr. Cha (apparently mis-transcribed as "Dr. Chow" in the transcript) was then treating her with medication for pain. (*Id*. at 49.) The Record, however, does not reflect any visit by Plaintiff with Dr. Cha until August 18, 2011, although it does include a summary report from the Ryan Center, dated July 8, 2011, completed by Dr. Marc Rubenstein. (*Id.* at 599-600.) While that July 8 report does not mention Dr. Cha, it does note that Plaintiff had made

appears that her first visit there with Dr. Cha was on August 18, 2011, for reported back pain and insomnia. (*Id.* at 598.) Dr. Cha recorded Plaintiff's medications as Flexeril,[17] Desogen,[18] Ambien, Tylenol with Codeine,[19] and Tramadol-Acetaminophen.[20] (*Id.*) Dr. Cha recorded no spinal or paraspinal tenderness, but noted that Plaintiff had pain in the lower right cervical and lumbar regions of the spine. (*Id.* at 601.) Dr. Cha prescribed Flexeril and Tramadol-Acetaminophen. (*Id.* at 602.)

On November 18, 2011, Plaintiff had a follow-up visit with Dr. Cha. (*Id.* at 604-07.) At that time, Dr. Cha noted Plaintiff's medications to be Desogen, Flexeril, Tramadol-Acetaminophen, and Ambien. (*Id.* at 604.) Plaintiff reported chronic pain in her lower back, and rated it 10 out of 10 on the pain scale. (*Id.*) Plaintiff had tenderness in the lower cervical region of her neck and in her lower lumbosacral region. (*Id.* at 606.) Plaintiff had no spinal or paraspinal tenderness. (*Id.*) Dr. Cha noted that Plaintiff had consulted with Dr. Gallina, a spinal orthopedic surgeon (*see supra*, at n.7), and Plaintiff requested a re-referral for a follow-up on spinal surgery approval (R. at 606). Dr. Cha referred Plaintiff to St. Luke's Hospital for physical

_____

a walk-in visit to the Ryan Center on that date for prescription refills, and for orthopedic and neurologist referrals. (*Id.*) The July 8 report also notes that Plaintiff "[stood] and move[d] without obvious guarding of back pain." (*Id.* at 599.)

[17] Flexeril is a muscle relaxant. (*Cyclobenzaprine*, https://medlineplus.gov/druginfo/meds/a682514.html.)

[18] Desogen is an oral contraceptive. (*Estrogen and Progestin (Oral Contraceptives)*, https://medlineplus.gov/druginfo/meds/a601050.html.)

[19] Dr. Cha's report states, "Tylenol with Codeine pt does not know," which this Court takes to mean that Plaintiff either did not recall the precise name of that medication, or that she could not recall all of the medications she had been prescribed.

[20] Tramadol-Acetaminophen is a narcotic painkiller. (*Tramadol*, https://medlineplus.gov/druginfo/meds/a695011.html.)

therapy for her herniated discs, low cervical, and low lumbar region pain, all of which were noted to have resulted from the November 28, 2009 motor vehicle accident.  (*Id.*)[21]

<strong>2.    Evidence of Plaintiff's Condition After December 31, 2013, When Her Period of Eligibility for SSDI Benefits Ended__</strong>

<strong>a.    Evaluation by SSA Consulting Physician Dr. Thukral (May 27, 2014)_____</strong>

In 2014, the SSA's Division of Disability Determinations referred Plaintiff to another physician for a consultative medical examination – Dr. Thukral, whom Plaintiff saw on May 27, 2014.  (*Id.* at 583-86.)  At her examination by Dr. Thukral, Plaintiff complained of sharp and intermittent neck pain, which she rated an eight out of 10, on a 10-point scale, and which she reported was precipitated by any movement of the neck, pulling, and pushing.  (*Id.* at 583.)  She also reported lower backache, which she rated a 10 on a 10-point scale, and which she described as sharp and intermittent, precipitated by lifting, pulling, and pushing.  (*Id.*)  Finally, she complained of right wrist pain, which she rated as eight out of 10 and also described as sharp and intermittent, precipitated by gripping and writing.  (*Id.*)  Dr. Thukral noted that Plaintiff had undergone surgery in 2010 on her right wrist, and that rest and pain medication provided her with some relief of her neck, low back, and right wrist pain.  (*Id.*)  Dr. Thukral also noted that Plaintiff reported taking 600mg of Motrin as needed.  (*Id.* at 583-84.)

Dr. Thukral's report reflects that Plaintiff told him that she could not do cooking, cleaning, laundry, or shopping, due to her multiple joint pains.  (*Id.* at 584.)  The report further reflects that Plaintiff reported that she cared full-time for two of her children, then ages 10 and one-and-a-half; that she showered, bathed, and dressed herself daily; and that she watched

---

[21] The Record does not reflect if Plaintiff followed up for this physical therapy.

television, listened to the radio, read, went to her doctor's appointments, and socialized with friends.  (*Id.* at 584.)

Dr. Thukral found that Plaintiff's gait was normal, that she could walk on her heels and toes without difficulty, and that her squat was full and her stance normal.  (*Id.*)  He indicated that Plaintiff used no assistive devices, needed no help getting on or off the exam table, and was able to rise from a chair without difficulty.  (*Id.*)

Dr. Thukral reported that, on physical examination, Plaintiff's cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  (*Id.* at 585.) He indicated that Plaintiff had mild tenderness in the cervical spine, on movement.  (*Id.*)  He further indicated that Plaintiff's lumbar spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  (*Id.*)  He found "mild tenderness" in Plaintiff's lumbar spine, on movement, as well as "mild tenderness" in her right wrist, also on movement. (*Id.*)  He noted that Plaintiff's joints were stable and nontender, except for the cervical spine, lumbar spine, and right wrist.  (*Id.*)  He determined that Plaintiff's hand and finger dexterity was intact, and he reported her grip strength to be five out of five bilaterally.  (*Id.*)

Overall, Dr. Thukral diagnosed Plaintiff with neck pain, by history; lower backache, by history; and right wrist pain, by history.  (*Id.* at 586.)  Despite his seeming lack of significant positive findings, he indicated that Plaintiff's prognosis was "[f]air."  (*Id.*)

As his "medical source statement," Dr. Thukral stated that, "[o]n the basis of the examination, [Plaintiff] ha[d] no limitations for sitting or standing, but ha[d] mild limitations for pulling, pushing, lifting, carrying, and any other such-related activities due to the multiple joint pains as depicted above."  (*Id.*)

With respect to particular functional abilities, Dr. Thukral stated that Plaintiff could lift 11-20 pounds occasionally (up to 1/3 of an eight-hour workday), and up to 10 pounds continuously (over 2/3 of an eight-hour workday). (*Id.* at 587.) He further stated that Plaintiff could carry 11-20 pounds occasionally (up to 1/3 of an eight-hour workday), and up to 10 pounds continuously (over 2/3 of an eight-hour workday). (*Id.*) He also stated that Plaintiff could sit, stand, and/or walk for eight hours at one time without interruption, and that she could sit, stand, and/or walk for a total of eight hours in an eight-hour workday. (*Id.* at 588.) He determined that Plaintiff was able to reach overhead, reach otherwise, handle, finger, feel, push, and pull frequently (1/3 to 2/3 of an eight-hour workday) with both hands. (*Id.*) He further determined that Plaintiff could climb stairs and ramps, climb ladders or scaffolds, balance, stoop, kneel, crouch, and crawl frequently (1/3 to 2/3 of an eight-hour workday) (*id.* at 590); that she could tolerate unprotected heights; humidity and wetness; dust, odors, fumes, and pulmonary irritants; extreme cold; extreme heat; and vibrations continuously (over 2/3 of an eight-hour workday) (*id.* at 591); that she could work with moving mechanical parts and operate a motor vehicle frequently (1/3 to 2/3 of an eight-hour workday) (*id.*); and that she could tolerate very loud noise, such as a jackhammer (*id.*). Finally, Dr. Thukral found that Plaintiff was able to shop; travel without a companion; ambulate without using a wheelchair, walker, two canes, or two crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace without the use of a single hand rail; prepare a simple meal and feed herself; care for her personal hygiene; and sort, handle, or use paper/files. (*Id.* at 592.)

### b.     Plaintiff's Testimony Before the ALJ
### at the Second Hearing (July 25, 2014)

Plaintiff testified before the ALJ for a second time on July 25, 2014, after the stipulated

remand.  (*Id.* at 415-42.)  At this second administrative hearing, Plaintiff was again represented

by Brigantic.  (*See id.* at 415.)

In response to the ALJ's question as to why she was unable to work, Plaintiff responded

that she "was declared disabled by the physical therapy," and that she had "neck, back, and wrist

problems."  (*Id.* at 423.)  Plaintiff further testified that she had pain in those areas (*see id.* at

423-24), explaining that she was unable to work "[d]ue to the back pain, the neck pain, and the

wrist pain" (*id.* at 425).  With respect to her wrist, in particular, Plaintiff testified that she had

continued to experienced problems after having wrist surgery in February of 2010.  (*Id.* at 437.)

She testified that she had swelling and pain in her wrist, that she could not grip or grasp objects,

and that she experienced cramps and numbness in her wrist.  (*Id.*)

Plaintiff testified that she took Tylenol and Motrin, as needed (one or two per day), to

manage her pain symptoms; she acknowledged that the medications were helpful and that she

had no side effects.  (*Id.* at 425, 428.)  Plaintiff also testified that she wore a back brace

constantly, which, she stated, helped alleviate "a little bit of the pain."  (*Id.* at 426.)

Plaintiff's testimony at the July 2014 hearing was somewhat unclear as to when she had

last received treatment for her conditions.  She testified that she had sought medical treatment at

the Ryan Center on two separate occasions in 2013, and had received pain medication there.

(*See id.* at 426-29.)  The Record, however, contains medical records from the Ryan Center dating

only to 2011 (*see id.* at 598-607), suggesting that Plaintiff may have misremembered the dates

when she was there.  She also separately testified at the hearing that her last treatment for her

neck and back had been in 2012, although the Record is silent regarding any such treatment,

again suggesting she may have remembered the dates of her treatment incorrectly. (*Id.* at 424.) From the Record, it appears that over two years had likely elapsed from the date of Plaintiff's last treatment to the date of the hearing. Regardless of this, Plaintiff testified that she was "still in a lot of pain." (*Id.* at 425.)

Regarding the fact that Plaintiff had apparently not received treatment for some time, Brigantic again explained to the ALJ that Plaintiff had stopped seeking treatment because of the expiration of the no-fault insurance that had originally paid for her medical expenses resulting from the motor vehicle accident. (*Id.* at 437.) Brigantic also stated that Plaintiff had reached maximum medical improvement. (*Id.* at 429.) He further told the ALJ that Plaintiff had been a candidate for surgery, but that the automotive insurer had not approved the cost of the surgery, and that, without insurance coverage, Plaintiff could not afford the surgery herself. (*Id.* at 429-30.)

Plaintiff testified that she had worked as a cashier at a retail store, and as a home health aide between 2000 and 2008. (*Id.* at 422-23.) She further testified that, as a cashier, she had remained standing until lunch or her break, and had been responsible for bringing her "supplies" to the floor prior to the start of her shift. (*Id.* at 433.) She also explained that, when she had worked in the shipping department in her job as a cashier, she had frequently been required to lift and carry multiple garments at a time, together weighing around 20 to 25 pounds. (*Id.* at 433-34.) Plaintiff also stated that she had mainly used her right hand in her work as a cashier. (*Id.* at 434.)

As noted above, Plaintiff testified that she took care of her two younger children with help from her other children. (*Id.* at 425.) She also told the ALJ that she mainly stayed home, "trying to stay out of pain." (*Id.* at 428.) Plaintiff denied being able to do the household's

cooking, cleaning, or shopping (*id.*), testifying that her daughter did the cooking (*see id.* at 431.)

In her testimony, Plaintiff denied using public transportation. (*Id.* at 431-32.) Plaintiff told the ALJ that she dressed and bathed herself, although with help from her children. (*Id.* at 431.) When the ALJ later asked Plaintiff whether she had told the consulting physician (presumably Dr. Thukral) who examined her a few months prior to the hearing that she bathed and dressed herself daily, Plaintiff replied that she had told the doctor that she bathed and dressed with the help of her daughter. (*Id.* at 438.)

Plaintiff testified that she could sit for five or 10 minutes at a time, stand for five minutes, walk four to five blocks, and lift and/or carry five pounds. (*Id.* at 430.) She stated that she could not bend and pick up a piece of paper from the floor, push or pull a shopping cart, or make fists or manipulate her fingers without pain. (*Id.* at 430-31.) She explained that she "tr[ied] to use [her] left hand as much as possible." (*Id.* at 431.) Plaintiff also testified to having difficulty moving her neck, as this caused her "excruciating pain," and testified that she was unable to turn her neck. (*Id.* at 436.) She also stated that she experienced stiffness when she twisted or turned. (*Id.*)

### c. <u>Final Report from Dr. Drukman (July 29, 2014)</u>

Upon a visit from Plaintiff on July 29, 2014, at least two years from the date the Record reflects Plaintiff had last seen her (*see supra*, at n.15), Dr. Drukman noted that Plaintiff's symptoms of neck pain, lower back pain, and right wrist stiffness continued. (*Id.* at 634.) At the time of the 2014 visit, Dr. Drukman wrote that Plaintiff reportedly had difficulty standing for longer than five minutes; walking more than four city blocks; sitting for longer than 10 to 15 minutes; and lifting, holding objects, and grasping with her right hand. (*Id.*) Plaintiff apparently again reported that she had help with her daily activities and household chores from her family

members.  (*Id.*)  She also reported that she was not able to resume her work because of pain and limitations in the injured areas, but that she was reluctant to pursue lumbar spine surgery, and had not received epidural steroid injections in her back.  (*Id.*)  Dr. Drukman noted that Plaintiff was then taking 600mg of ibuprofen, as well as over-the-counter Tylenol Extra Strength daily, and that she also applied ice and hot packs to her upper and lower trunk, which gave her "temporary help."  (*Id.*)

Plaintiff was found to have diminished right hand grip strength (15 pounds on the right, with pain; 70 pounds on the left (*id.* at 636)) and right wrist flexion.  (*Id.* at 635.)  Dr. Drukman found moderate tenderness in Plaintiff's C3-C4, C4-C5, and C6-C7 interspinous processes, L4, L5, L5, S1 interspinous processes, right lumbar paraspinals, and right sacroiliac/gluteus area.  (*Id.*)  Dr. Drukman also found weakness in Plaintiff's right wrist flexion, right hand grip, and lumbar extension.  (*Id.*)  Plaintiff's gait was noted to be "[n]ear normal with some guarding in the upper trunk," and Plaintiff was negative for toe walk, but apparently "uncomfortable due to tightness in the lower back."  (*Id.* at 637.)  As Dr. Drukman concluded:

> In spite of significant time since the accident, [Plaintiff] remains symptomatic and has difficulties with her daily activities.  In accordance with the history presented, findings on her multiple examinations, response to the treatment received, review of the findings of the MRI and x-rays study, it is my professional opinion that [Plaintiff's] impairments are directly causally related to the accident of 11-29-2009.  Due to persistence of her symptoms and limitations in the range of motions and weakness in the injured areas it appears that [Plaintiff's] impairments are permanent in nature, the prognosis for full recovery is poor.  [Plaintiff] is markedly partially disabled.  Her limitations are activities requiring frequent repetitive forceful range of motions with her right wrist/hand, prolonged standing, frequent bending, twisting, reaching above the shoulder level, lifting more than 5 lbs with the right hand, and stooped posture.

(*Id.*)

### D.    **Procedural History**

As discussed above, Plaintiff filed her application for SSDI benefits on June 16, 2010 (*id.* at 104-09), alleging a disability onset date of November 28, 2009 (*id.* at 106). Plaintiff's claim was denied on September 9, 2010. (*Id.* at 57.) Plaintiff requested a hearing on November 12, 2010 (*id.* at 62), and a hearing was held before ALJ Rowe on August 3, 2011. (*See id.* at 36-55.) Plaintiff was represented at the hearing by Brigantic, her attorney. ALJ Rowe rendered his first unfavorable decision on October 12, 2011. (*See id.* at 23-32.) On May 17, 2013, the Appeals Council declined to review the ALJ's October 12, 2011 decision. (*Id.* at 455.)

Plaintiff commenced an action in this Court on July 12, 2013. (See Dkt. 1, in Case No. 13cv4870 (RA).) On December 3, 2013, the Court entered a Stipulation and Order remanding the case for further administrative proceedings. (Dkt. 5, in 13cv4870 (RA).) On February 18, 2014, the Appeals Council remanded the case to the ALJ, and directed the ALJ (1) to evaluate the opinion of treating physician, Dr. Drukman, that Plaintiff's limitations were frequent, repetitive, forceful range of motion with the right wrist, frequent twisting, prolonged standing, prolonged sitting, and frequent bending; (2) to discuss the portion of consulting physician Dr. Eyassu's opinion regarding Plaintiff's limitations in gripping and grasping with the right hand; (3) to give further consideration to Plaintiff's RFC, and provide reasoning for the ALJ's RFC determination with specific references to evidence in the Record; and (4) to provide a further evaluation of whether Plaintiff could perform her past relevant work as a cashier. (R. at 466-67.)

A second hearing was held before ALJ Rowe on July 25, 2014. (*See id.* at 415-42.) Plaintiff was again represented at the hearing by Brigantic. The ALJ rendered his second unfavorable decision in this case on September 3, 2014. (*See id.* at 391-405.) On October 13,

2015, the Appeals Council declined to review the ALJ's September 3, 2014 decision. (*Id.* at 384.)

Plaintiff filed her Complaint in this action on December 9, 2015. (*See* Compl. (Dkt. 1).) Plaintiff filed a motion for judgment on the pleadings on November 4, 2016 (*see* Dkts. 32, 33), and Defendant filed her opposition and cross-motion for judgment on the pleadings on December 19, 2016 (*see* Dkt. 34; Defendant's Oppos[i]tion to Plaintiff's Motion for Judgment on the Pleadings and in Support of her Cross-Motion for Judgment on the Pleadings, dated Dec. 19, 2016 ("Def. Opp.") (Dkt. 35)). Plaintiff filed reply papers on January 19, 2017 (Plaintiff Lashonda D. Littlefield's Reply Brief in Further Support of her Motion for Judgment on the Pleadings, dated Jan. 19, 2017 ("Reply") (Dkt. 36)), and Defendant filed no further reply on her cross-motion.

Plaintiff's motion for judgment on the pleadings is now before this Court for a report and recommendation. (*See* Dkt. 18.)

## DISCUSSION

## I.  STANDARD OF REVIEW

### A.  Review of ALJ's Decision

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes 'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by considering the contents of the pleadings,'" *id.* (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of a decision of the Commissioner is limited. The Commissioner's decision is final, provided that the correct legal standards are applied and findings of fact are

supported by substantial evidence. 42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). "[W]here an error of law has been made that might have affected the disposition of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted)). Thus, the first step is to ensure that the Commissioner applied the correct legal standards. *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The next step is to determine whether the Commissioner's decision is supported by substantial evidence. *See Tejada*, 167 F.3d at 773. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). In making this determination, a court must consider the underlying record. The reviewing court does not, however, decide *de novo* whether a claimant is disabled. *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997). Thus, if the correct legal principles have been applied, this Court must uphold the Commissioner's decision upon a finding of substantial evidence, even where contrary evidence exists. *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (affirming decision where substantial evidence supported both sides).

**B.    The Five-Step Sequential Evaluation**

To be entitled to disability benefits under the Act, a claimant must establish his or her

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§§ 423(d)(1)(A), 1382c(a)(3)(A); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  An

individual is considered to be under a disability only if the individual's physical or mental

impairments are of such severity that he or she is not only unable to do his or her previous work,

but also cannot, considering his or her age, education, and work experience, engage in any other

kind of substantial gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B).

In evaluating a disability claim, an ALJ must follow the five-step procedure set out in

the regulations governing the administration of Social Security benefits.  *See* 20 C.F.R.

§ 404.1520; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  Throughout the

inquiry, the ALJ must consider four primary sources of evidence:  "(1) the objective medical

facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or

disability testified to by the claimant or others; and (4) the claimant's educational background,

age, and work experience."  *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citations omitted).

The first step of the inquiry requires the ALJ to determine whether the claimant is

engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  If not, at the second step,

the ALJ determines whether the claimant has a "severe" impairment or combination of

impairments that significantly limits his or her physical or mental ability to do basic work

activities.  *Id.* §§ 404.1520(a)(4)(ii), 404.1520(c).  If the claimant does suffer from such an

impairment, then the third step requires the ALJ to determine whether this impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  *Id.* § 404.1520(a)(4)(iii).  If it does, then the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience."  *Id.*

If the claimant's impairment does not meet or equal a listed impairment, then the ALJ must determine, based on all the relevant evidence in the record, the claimant's RFC, or ability to perform physical and mental work activities on a sustained basis.  *Id.* § 404.1545.  The ALJ then proceeds to the fourth step of the inquiry, which requires the ALJ to determine whether the claimant's RFC allows the claimant to perform his or her "past relevant work."  *Id.* § 404.1520(a)(4)(iv).  Finally, if the claimant is unable to perform his or her past relevant work, the fifth step requires the ALJ to determine whether, in light of the claimant's RFC, age, education, and work experience, the claimant is capable of performing "any other work" that exists in the national economy.  *Id.* §§ 404.1520(a)(4)(v), 404.1520(g).

On the first four steps of the five-step evaluation, the claimant generally bears the burden of establishing facts to support his or her claim.  *See Berry*, 675 F.2d at 467 (citation omitted).  At the fifth step, the burden shifts to the Commissioner to "show that there is work in the national economy that the claimant can do."  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).  The Commissioner must establish that the alternative work "exists in significant numbers" in the national economy and that the claimant can perform this work, given his or her RFC and vocational factors.  20 C.F.R. § 404.1560(c)(2).  Where the claimant suffers from exertional impairments only, the Commissioner can satisfy this burden by referring to the Medical-Vocational Guidelines, set out in 20 C.F.R. Pt. 404, Subpt. P, App. 2 (the "Grids").

Where, however, the claimant suffers from nonexertional impairments (such as postural impairments) that "'significantly limit the range of work permitted by his [or her] exertional limitations,'" the ALJ is required to consult with a vocational expert," rather than rely exclusively on these published Grids. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986) (citations omitted)). "A nonexertional impairment 'significantly limit[s]' a claimant's range of work when it causes an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'" *Id.* at 410-11 (quoting *Bapp*, 802 F.2d at 605-06).

**C.  Duty to Develop the Record**

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record," *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)), and failure to develop the record may be grounds for remand, *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999). "[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel.'" *Id.* at 79 (quoting *Perez*, 77 F.3d at 47). The SSA regulations explain this duty to claimants this way:

> Before we make a determination that you are not disabled, we will develop your complete medical history . . . [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports. . . . 'Every reasonable effort' means that we will make an initial request for evidence from your medical source and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one follow-up request to obtain the medical evidence necessary to make a determination.

20 C.F.R. §§ 404.1512(d), (d)(1).  The regulations further explain that a claimant's "complete medical history" means the records of his or her "medical source(s)."  *Id.* § 404.1512(d)(2).  If the information obtained from medical sources is insufficient to make a disability determination, or if the ALJ is unable to seek clarification from treating sources, the regulations also provide that the ALJ should ask the claimant to attend one or more consultative evaluations.  20 C.F.R. §§ 404.1512(e), 404.1517.

Where there are no "obvious gaps" in the record and where the ALJ already "possesses a complete medical history," the ALJ is "under no obligation to seek additional information in advance of rejecting a benefits claim."  *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (summary order) (quoting *Rosa*, 168 F.3d at 79 n.5).

### D.  **The Treating Physician Rule**

The medical opinion of a treating source as to "the nature and severity of [a claimant's] impairments" is entitled to "controlling weight," where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  "[T]reating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source who . . . has provided [the claimant] with medical treatment or evaluation" and who has had "an ongoing treatment relationship" with him or her.  20 C.F.R. § 404.1502.[22]  Treating physicians' opinions are generally accorded deference because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's

---

[22] A medical source who has treated or evaluated the claimant "only a few times" may be considered a treating source "if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)."  20 C.F.R. § 404.1502.

condition and "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations."  20 C.F.R. § 404.1527(c)(2); *see Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004).

Where an ALJ determines that a treating physician's opinion is not entitled to "controlling weight," the ALJ must "give good reasons" for the weight accorded to the opinion. 20 C.F.R. § 404.1502.  Failure to "give good reasons" is grounds for remand.  *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion . . . .").  Moreover, in determining the weight to be accorded to an opinion of a treating physician, the ALJ "must apply a series of factors," *Aronis v. Barnhart*, No. 02cv7660 (SAS), 2003 WL 22953167, at *5 (S.D.N.Y. Dec. 15, 2003) (citing, *inter alia*, 20 C.F.R. § 404.1527(d)(2)[23]), including:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including whether the treatment received was particular to the claimant's impairment; (3) the supportability of the physician's opinion; (4) the consistency of the physician's opinion with the record as a whole; and (5) the specialization of the physician providing the opinion, 20 C.F.R. § 404.1527(c)(2)-(5); *see Shaw*, 221 F.3d at 134 (noting that these five factors "must be considered when the treating physician's opinion is not given controlling weight"); *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 507 (S.D.N.Y. 2014) (requiring an ALJ to "explicitly consider" the factors

---

[23] On February 23, 2012, the Commissioner amended 20 C.F.R. § 404.1527, by, among other things, removing paragraph (c), and re-designating paragraphs (d) through (f) as paragraphs (c) through (e).

in order to "override the opinion of a treating physician" (citing *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013))).

Even where a treating physician's opinion is not entitled to "controlling weight," it is generally entitled to "more weight" than the opinions of non-treating and non-examining sources. 20 C.F.R. § 404.1527(c)(2); *see* Social Security Ruling 96-2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996) ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."); *see also Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 589 (S.D.N.Y. 2000). A consultative physician's opinion, by contrast, is generally entitled to "little weight." *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009) (internal quotation marks and citation omitted). This is because consultative examinations "are often brief, are generally performed without benefit or review of the claimant's medical history, and, at best, only give a glimpse of the claimant on a single day. Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons." *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) (internal quotation marks and citation omitted).

### E.     Assessment of a Claimant's Credibility

Assessment of a claimant's credibility with respect to subjective complaints about his or her symptoms or the effect of those symptoms on the claimant's ability to work involves a two-step process. Where a claimant complains that certain symptoms limit his or her capacity to work, the ALJ is required, first, to determine whether the claimant suffers from a "medically determinable impairment[] that could reasonably be expected to produce" the symptoms alleged. 20 C.F.R. § 404.1529(c)(1). Assuming the ALJ finds such an impairment, then the ALJ must take the second step of evaluating the intensity and persistence of the claimant's symptoms. *Id.*;

*see also Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010). In doing so, the ALJ must

consider all of the available evidence, and must not "reject statements about the intensity and

persistence of pain and other symptoms 'solely because the available objective medical evidence

does not substantiate [the claimant's] statements.'" *Cichocki v. Astrue*, 534 F. App'x 71, 76

(2d Cir. 2013) (quoting 20 C.F.R. § 416.929(c)(1)); *see also* 20 C.F.R. § 404.1529(c)(1).

Instead, where the claimant's contentions regarding his or her symptoms are not substantiated by

the objective medical evidence, the ALJ must consider the other evidence and make a finding as

to the claimant's credibility, in order to determine the extent to which the claimant's symptoms

affect his or her ability to do basic work activities. *Id.*; *see also Meadors*, 370 F. App'x at 183

(citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)); *Taylor v. Barnhart*, 83 F. App'x 347, 350-51 (2d Cir.

2003) (summary order); Social Security Ruling ("SSR") SSR 96-7p (S.S.A. July 2, 1996).[24])

"While an ALJ 'is required to take [a] claimant's reports of pain and other limitations

into account' [in making a credibility determination] . . . he or she is 'not required to accept the

claimant's subjective complaints without question.'" *Campbell v. Astrue*, 465 F. App'x 4, 7

(2d Cir. 2012) (summary order) (quoting *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010)).

"Rather, the ALJ may exercise discretion in weighing the credibility of the claimant's testimony

---

[24] Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p. *See* SSR 16-3p, 2016 WL 1237954 (Mar. 28, 2016). The new ruling eliminates the use of the term "credibility" from the SSA's sub-regulatory policy, in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." *Id*. at *1. Instead, adjudicators are instructed to "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms." *Id*. at *2. Both the two-step process for evaluating an individual's symptoms and the factors used to evaluate the intensity, persistence and limiting effects of an individual's symptoms remain consistent between the former and current rulings. *Compare* SSR 96-7p *with* SSR 16-3p. As the ALJ's decision in this matter was issued before the new ruling went into effect, this Court will review the ALJ's credibility assessment under the earlier version, SSR 96-7p.

in light of the other evidence in the record." *Id.* The ALJ must, however, include "specific reasons for [his or her] finding on credibility, supported by the evidence in the case record," and the reasons must make it sufficiently clear for a reviewer to determine "the weight the [ALJ] gave to the [claimant's] statements and the reasons for that weight." *See* SSR 96-7p. The factors that an ALJ should consider in evaluating the claimant's credibility are: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the symptoms; (5) any treatment, other than medication, that the claimant has received for relief of the symptoms; (6) any other measures that the claimant employs to relieve the symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

## II.     THE ALJ'S DECISION

The decision now at issue is the ALJ's second determination, made on September 3, 2014, that Plaintiff had not been disabled since her claimed onset date of November 28, 2009. (*See generally* R. at 391-405.) In reaching this decision, the ALJ applied the five-step sequential evaluation procedure.

### A.     Sequential Evaluation, Steps One Through Three

At Step One, the ALJ determined that Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of November 28, 2009 through the date she was last insured of December 31, 2013. (*Id.* at 397.) At Step Two, the ALJ found that Plaintiff had the following "severe" impairments through the date last insured: lumbar disc disease, cervical disc disease, and surgical repair of a right wrist injury (partial tear of the scaphoid interosseous ligament tear of the triangular fibrocartilage complex). (*Id.*) At Step Three, the

ALJ found that Plaintiff's impairments did not meet or medically equal the severity of any

impairment listed in section 1.00ff of Appendix 1, Subpart P of Regulations No. 4, regarding

impairments of the musculoskeletal system. (*Id.* at 397-98.)

> **B.** **The ALJ's Assessment of Plaintiff's RFC and Determination, at Step Four, That Plaintiff Was Capable of Performing Her Relevant Past Work as a Cashier**

The ALJ determined that Plaintiff had the RFC to perform light work, as defined in

20 C.F.R. § 404.1567(b), except that she was limited to no more than frequent (one-third to two-

thirds of the workday) twisting or turning objects with the right arm and wrist. (*Id.* at 398.)

Prior to making this determination, the ALJ surveyed the medical evidence, and concluded that it

showed that Plaintiff had "sustained injuries in a motor vehicle accident in November 2009."

(*Id.* at 403.) The ALJ's characterization of that evidence, however, ultimately led him to

conclude that Plaintiff's injuries "[were] not disabling within the meaning of the Social Security

Act." (*Id.*)

With respect to the injury to Plaintiff's right wrist, the ALJ found that the evidence

showed that this injury was successfully surgically repaired in February 2010. (*Id.*) According

to the ALJ, "[l]iterally all of the . . . objective evidence," barring Dr. Drukman's July 2014

report, "show[ed] that [Plaintiff's] wrist condition improved significantly after surgery in

February 2010 and that it . . . caused no more than very mild limitations since June 2010." (*Id.*)

On this point, the ALJ cited Dr. Drukman's reports, which, the ALJ stated, "clearly show[ed]

that by June 2010 [Plaintiff's] wrist condition was improved significantly from both a pain and

functioning standpoint." (*Id.*) In particular, the ALJ noted that Plaintiff's grip strength was

recorded, at that time, as 60 pounds and that she was not taking any prescribed pain medication.

(*Id.*) He also noted that electrodiagnostic testing (performed in June 2010) showed no evidence

of radiculopathy, nor ulnar or median neuropathy, in Plaintiff's right wrist. (*Id.*) The ALJ also pointed out that, in her June 2010 report, "Dr. Drukman noted no limitations involving the wrist" (*id.*); that, in August 2010, "Dr. Eyassu noted only mildly (4/5) diminished grip strength" (*id.*); that, in October 2010, "Dr. Nesen noted no problems of the wrist" (*id.*);[25] that, in each of her reports in 2011, "Dr. Cha noted no positive findings related to the wrist" (*id.*); and that, in his 2014 report, "Dr. Thukral also noted only mild tenderness of the wrist on movement with normal grip strength" (*id.*). The ALJ found that "there [was] certainly no medical evidence to show that [Plaintiff's] wrist condition . . . worsened since June 2010, other than the last report from Dr. Drukman in July 2014." (*Id.*)

As to her claimed spinal conditions and related impairments, the ALJ stated that Plaintiff had "received very little treatment for her neck/low back conditions." (*Id.*) Summarizing his view of Plaintiff's treatment for these conditions, the ALJ noted that Plaintiff had seen Dr. Drukman from December 2009 through June 2010. (*Id.*) He also noted that Dr. Gallina had given Plaintiff an orthopedic evaluation in March 2010 and had told Plaintiff that she was a candidate for surgery, but that Plaintiff did not follow up with Dr. Gallina after she completed physical therapy. (*Id.*) The ALJ further noted that Plaintiff had seen pain specialist Dr. Nesen once, in October 2010; that she had then received no further treatment until July 2011 (*i.e.*, when she went to the Ryan Center), seeing Dr. Cha twice, in August and November 2011; and that, after that, she had received no further treatment for her neck and low back. (*See id.*)

In weighing the medical opinion evidence, the ALJ assigned "little weight to the conclusions cited by Dr. Drukman in July 2014," which, he stated, were "based more on

---

[25] The ALJ mistakenly indicated that Dr. Nesen made this notation in November 2010. (*See id.*)

[Plaintiff's] subjective complaints than the medical history and objective findings." (*Id.* at 404.) Also with respect to that 2014 opinion, the ALJ stated that Dr. Drukman's "assessment regarding [Plaintiff's] right wrist complaints [did] not take into consideration at all her own . . . record of treatment of this injury in January-September 2010, which clearly show[ed] that [Plaintiff's] condition [had] improved considerably by September 2010." (*Id.*) The ALJ also gave "little weight" to Dr. Drukman's January 2010 opinion, on the ground that "it was made only days after [Plaintiff] sustained her injuries," and to her June 2010 opinion, on the ground that "it was made within 12 months of [Plaintiff's] injuries." (*Id.*)

The ALJ "[gave] considerable weight to the conclusions of Dr. Eyassu," summarizing those August 2010 conclusions as recommending that Plaintiff "avoid heavy lifting and sustained pushing and pulling" and as finding Plaintiff to have a "moderate limitation on activity that would require repetitive bending, excessive neck movement, or turning and twisting." (*Id.*) In the ALJ's view, these conclusions were "consistent with the objective evidence that show[ed] [Plaintiff's] right wrist improved greatly by June 2010 but still was causing mild difficulty, and that her neck and back pain caused some, but not disabling, limitations." (*Id.*)

The ALJ "[gave] the most weight to the [May 2014] assessment of Dr. Thukral," who, according to the ALJ, "reported near-normal findings and was familiar with the expanded medical record." (*Id.*) The ALJ noted, in particular, Dr. Thukral's observations that Plaintiff used no prescribed pain medication and cared for her two younger children. (*Id.*)

Overall, the ALJ found that the medical evidence did not substantiate Plaintiff's statements regarding the severity of her symptoms or the degree of her physical limitations. (*Id.* at 403-04.) The ALJ noted that "[n]one of the doctors reported any gait disturbance or need for a cane." (*Id.* at 404.) He described Plaintiff's neurological findings as "consistently normal,

showing no evidence of reflex pathology, sensation deficits, or reduced muscle strength," and similarly stated that both of Dr. Cha's examinations of Plaintiff in 2011 were "essentially normal," as was Dr. Thukral's examination in 2014. (*Id.*) He pointed out that Plaintiff had no muscle atrophy, to indicate disuse. (*Id.*) He also stated that Plaintiff had used mostly over-the-counter medication since June 2010. (*Id.*) Finally, he noted that Plaintiff maintained a household with two young children, then 11 and one-and-a-half years old, and commented that, although her older children helped Plaintiff with childcare, they did not live with her, "and [were] therefore not available all of the time." (*Id.*)

With respect to her alleged wrist pain, the ALJ concluded that "[Plaintiff's] statements regarding the pain and functional limitations she experience[d] . . . (which include[d] testimony that she [was] unable to bathe or dress herself and [had to] rely on her 11-year-old daughter to help her with these things) [were] not at all credible." (*Id.* at 403.) With respect to Plaintiff's other complaints, the ALJ also found Plaintiff's descriptions of the severity of her symptoms and degree of her limitations to lack credibility, in light of "the entire record." (*Id.* at 404 (describing the Record as reflecting "the paucity of treatment, the rather negative findings reported on physical examinations, the non-use of prescribed pain medication, [and] the claimant's activities (which include[d] caring for a child born in late 2012)").) In short, the ALJ found that Plaintiff had "attempted to overstate the extent of her difficulties to a degree far beyond anything warranted by her records or even her subjective presentations to her doctors," concluding that, "[w]hile it [was] clear that [Plaintiff] ha[d] diagnosed musculoskeletal conditions, . . . generally speaking she ha[d] attempted to portray herself as a lot . . . more impaired than she actually [was]." (*Id.*)

At Step Four, in light of his RFC determination, the ALJ concluded that Plaintiff was capable of performing her past relevant work as a cashier.  (*Id.*)  The ALJ relied on Listing 211.462-018 of the Dictionary of Occupational Titles ("DOT"), which describes the work-related activities of a "cashier-wrapper."  (*Id.*)  Cashier-wrapper work is categorized as semi-skilled, with light exertional demands.  (*See id*. at 404-05.)  The ALJ concluded, without further explanation, that Plaintiff was able to sit, stand, walk, lift, carry, push, pull, use her arms and hands, and twist and/or turn objects frequently, to the degree required by this job.  (*Id.* at 405.)  Also without further explanation, the ALJ found that Plaintiff "was able to perform . . . this job as performed in the national economy."  (*Id.*)  Accordingly, without reaching Step Five of the sequential evaluation, the ALJ concluded that Plaintiff was not under a disability as defined in the Act at any time from November 28, 2009 through December 21, 2013.  (*Id.* at 405.)

## III.  REVIEW OF THE ALJ'S DECISION

### A.  Whether the Record Was Sufficiently Developed

As Plaintiff reported that her disability began on November 28, 2009, the relevant period under review for Plaintiff's SSDI benefits runs from that date through December 31, 2013, the date that Plaintiff was last insured.  *Gonzalez ex rel. Guzman v. Secretary of U.S. Department of Health & Human Services*, 360 F. App'x 240, 242 (2d Cir. 2010) (citing 42 U.S.C. §§ 423(a)(1)(A), (c); *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989)); *see also* 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1); 20 C.F.R. §§ 404.130(b), 404.315(a).[26]  To be eligible for SSDI

---

[26] "An applicant's 'insured status' is generally dependent upon a ratio of accumulated 'quarters of coverage,'" *i.e.*, quarters in which the applicant earned wages and paid taxes, "to total quarters."  *Arnone*, 882 F.2d at 37-38.  To qualify for SSDI, an applicant must establish that he or she became disabled on or before the expiration of his or her insured status.  *Id.* at 38. Here, it is undisputed that Plaintiff's last date of insured coverage was December 31, 2013. (R. at 113, 144.)

benefits, Plaintiff must show she had a disabling condition, lasting 12 months or longer, within that period of coverage. *See Gonzalez ex rel. Guzman*, 360 F. App'x at 242 (citing 42 U.S.C. §§ 423(a)(1)(A), (c); *Arnone*, 882 F.2d at 37.

As noted above, however, the Record contains far more evidence regarding Plaintiff's medical conditions and impairments for the first year of her alleged disability than for any later period. Indeed, after Dr. Nesen's report of Plaintiff's visit with him on October 11, 2010, the Record contains no further relevant medical evidence within the period at issue, other than the records of Plaintiff's visits to the Ryan Center, in July, August, and November of 2011. In fact, both the consultative report of Dr. Thukral (based on an examination of Plaintiff conducted on May 27, 2014) and Dr. Drukman's last report (based on a visit by Plaintiff on July 29, 2014) actually fall outside the period under consideration.

Nonetheless, despite the near absence of medical evidence for nearly three years of the roughly four-year period under review (with only limited medical evidence for 2011, and virtually none at all for 2012 through 2013), this Court cannot conclude that the ALJ neglected his obligation to develop the Record in this case. Plaintiff has indicated that she stopped seeking treatment for financial reasons. (*See id.* at 38, 437, 599.) Further, based on the follow-up by Plaintiff's attorney – who apparently secured and supplied the Ryan Center records, all of which date to 2011 – it appears that Plaintiff was mistaken when she testified at the 2014 hearing that she had seen a doctor at the Ryan Center in 2013. (R. at 426-29; *see also id.* at 598-607 (Ryan Center records).) Otherwise, Plaintiff confirmed at the 2014 hearing that she had not sought medical treatment for her alleged disabling conditions in the two years prior to the hearing date. (*See id.* at 426.) Her visit to the St. Luke's emergency department and subsequent follow-up appointment with Dr. Drukman in 2012 concerned a fall that Plaintiff took at a fast food

restaurant while pregnant, and Plaintiff does not contend that this fall had any bearing on her disability claim. (*Id.* at 609-17, 619-23.) In fact, in her briefing on the pending motions, Plaintiff makes no argument regarding the ALJ's duty to develop the record, raising no suggestion that additional, pertinent medical records may exist. Although the ALJ has an independent and affirmative duty to develop the record, that duty only arises where there are "obvious gaps" in the record, such that the ALJ does not possess the claimant's complete medical history. *Swiantek*, 588 Fed. App'x 82, 84 (2d Cir. 2015) (summary order). Here, the stretches of time for which there are no medical records in the Record are explained by Plaintiff's conceded lack of treatment.

As the Record was adequately developed, but contains such meager medical evidence regarding Plaintiff's impairments for the last three years of her claimed period of disability, Plaintiff has little viable basis for challenging the ALJ's decision, as to those years. *See Navan v. Astrue*, 303 F. App'x 18, 20 (2d Cir. 2008) (claims of disability undermined by failure to seek regular medical treatment). Nonetheless, with the proper application of the treating physician rule and a proper assessment of Plaintiff's credibility, as discussed below, it is possible that Plaintiff could be found to have been disabled for at least the first 12 months after her accident, or through the date of her treatment at the Ryan Center in 2011, or potentially even longer, if Dr. Drukman's final report in 2014 were credited and found to support the conclusion that many of the same physical limitations he observed years earlier were still present and unresolved.

### B.    <u>Errors Claimed by Plaintiff</u>

Turning to the question of whether the ALJ's determination that Plaintiff was not disabled, even for the 12 months immediately following her accident, was supported by substantial evidence, this Court looks to the three specific challenges raised by Plaintiff: (1) the

ALJ's purported failure to comply with the "treating physician rule," (2) the ALJ's allegedly flawed determination of Plaintiff's RFC, particularly with respect to his conclusion that Plaintiff was capable of performing her past work as a cashier, and (3) the ALJ's allegedly improper assessment of Plaintiff's credibility. For purposes of this Report and Recommendation, this Court will first address the ALJ's application of the treating physician rule, then his assessment of Plaintiff's credibility, and, finally, his RFC and ultimate disability determinations.

## 1.    Failure To Comply With the Treating Physician Rule

With respect to the treating physician rule, Plaintiff frames the law by stating that "[t]he opinion of a treating physician as to the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record" (Pl. Mem., at 33 (internal citations omitted)), and that a medical specialist's opinion related to his or her area of specialization should at least be accorded greater weight than the opinion of a source who is not a specialist (id., at 34-35 (citing 20 C.F.R. § 404.1527(c)(5))). Plaintiff then argues that the ALJ not only failed to comply with these requirements, but "essentially stood these rules for weighing medical evidence on their collective head." (Pl. Mem., at 35.) This Court agrees that, by according only "little weight" to the stated opinions of Dr. Drukman, and, by according far greater weight to the opinions of two consultant examiners without stating "good reasons" for doing so, the ALJ committed legal error.

Based on the Record, the only treatment provider who may be considered a "treating physician" for purposes of the "treating physician rule" is Dr. Drukman. Although Plaintiff also received treatment from other providers, including a pain-management specialist (Dr. Nesen) and an internist (Dr. Cha), the Record only contains records of one or two visits with those other providers, which is not sufficient to demonstrate the "longitudinal" treatment relationship that

justifies affording higher weight to those treaters' opinions than to the opinions of consulting physicians. *See, e.g.*, *Wilson v. Colvin*, No. 6:16cv06509 (MAT), 2017 WL 2821560, at *4 (W.D.N.Y. June 30, 2017) (collecting cases and stating that professional "[did] not count as a 'treating physician' because he did not have a longitudinal treating relationship with [p]laintiff"); *Petrie v. Astrue*, 412 Fed. App'x 401, 405 (2d Cir. 2011).[27]

As to Dr. Drukman, though, Plaintiff had a significant treatment relationship, characterized by numerous visits, over a period spanning nearly seven months from the date of her motor-vehicle accident. Dr. Drukman was a specialist in physical medicine and rehabilitation, prescribed Plaintiff's anti-inflammatory and pain medications, repeatedly examined her for orthopedic findings, reviewed her various imaging test results, referred her for a course of physical therapy, also referred her to a surgeon who operated on her wrist and to a spinal orthopedic surgeon for consultation, and followed her progress. During that period of time, and as set out in detail above, Dr. Drukman consistently opined that Plaintiff had limitations in reaching, grabbing, twisting, bending, standing, sitting, and walking. (*See* R. at 185, 186, 190, 202, 206.) Immediately after Plaintiff's accident, Dr. Drukman characterized these limitations as "marked" (*id.* at 185), and, although she did not provide that same characterization as time went on – and occasionally noted "improvement" in, for example,

---

[27] While Plaintiff attended physical therapy sessions three times weekly for almost seven months between December 2009 and June 2010 (see *supra*, at n.4), a physical therapist was not considered an "acceptable medical source" for purposes of the treating physician rule, under the regulations in place at the time the ALJ rendered his decision. *See Acevedo v. Colvin*, 20 F. Supp. 3d 377, 389 (W.D.N.Y. 2014); 20 CFR § 404.1513. Nonetheless, "[a]lthough physical therapists are not acceptable medical sources, the opinions of physical therapists may constitute substantial evidence where the opinions are well documented and supported by the medical evidence." *Acevedo*, 20 F. Supp. 3d at 389 (citing SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006)).

Plaintiff's gait (*see, e.g.*, *id.* at 189) – she consistently made findings of tenderness in Plaintiff's neck and back (*see id.* at 182, 187, 193, 198, 203), restricted range of motion (*id.* at 182-83, 187-88, 193-94, 198-99, 203-04), and "guarding" in Plaintiff's movement (*id.* at 184, 189, 195, 200, 205).

Upon Plaintiff's visits to her in May and June of 2010, Dr. Drukman noted that, post-wrist-surgery and after a course of physical therapy, Plaintiff was reporting "significantly" less (and more localized) pain in her right wrist (*see id.* at 197), such that, by the last of Plaintiff's visits in 2010, Dr. Drukman found that Plaintiff's right-hand grip strength differed only slightly from her left-hand grip strength (60 pounds, as opposed to 65) (*see id.* at 205). Nonetheless, even in June of 2010 (over six months from the date of the accident, and three months post-surgery), Dr. Drukman still noted that Plaintiff was reporting difficulty performing certain household tasks that required the use of her hand (such as cutting vegetables) (*id.* at 202), and Dr. Drukman continued to find at least some tenderness in Plaintiff's right dorsal wrist and relative weakness in her right wrist flexion. (*Id.* at 203.) Moreover, despite the passage of time and course of medication and physical therapy, Dr. Drukman continued to find that, months after the accident, Plaintiff still had limitations related to her neck and back, including in abilities that the doctor associated with Plaintiff's past work as a cashier: "prolonged standing, frequent twisting, bending, and reaching." (*Id.* at 205.)

Dr. Drukman also repeatedly opined, throughout the period of her treatment of Plaintiff in 2010, that Plaintiff was "temporarily totally disabled" (*see id.* at 196, 201, 206) and her prognosis for recovery "[g]uarded" (*id.* at 185, 190, 196, 201, 206). Then, upon seeing Plaintiff again in 2014 – and finding that her "limitations in . . . range of motions and weakness in the injured areas" had persisted even after that significant passage of time – Dr. Drukman altered her

prior views and opined that Plaintiff's impairments must be considered "permanent in nature," and her "prognosis for full recovery" to be "poor" (*id.* at 637). While recognizing that the ultimate decision on disability is reserved to the Commissioner, *see* 20 § C.F.R. 404.1527(d); *see also Lowry v. Astrue*, 474 F. App'x 801, 804 (2d Cir. 2012) (summary order); *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999), this Court notes that Dr. Drukman's relevant views in 2014 as to the nature and extent of Plaintiff's physical limitations would have been informed by her past, close familiarity with Plaintiff's conditions and test records. In this regard, consistent with her prior findings and upon review of Plaintiff's MRIs and X-rays, Dr. Drukman found, in 2014, that Plaintiff continued to be limited in her ability to engage in "activities requiring frequent repetitive forceful range of motions with her right wrist/hand" and "lifting more than 5 [pounds]" with that hand, as well as activities requiring "prolonged standing, frequent bending, twisting, reaching above the shoulder level, . . . and stooped posture." (*Id.* at 637.)

In discussing the weight that he assigned to Dr. Drukman's opinions, the ALJ referenced three of Dr. Drukman's several opinions regarding Plaintiff's limitations – one given upon Plaintiff's second visit in January 2010, a second given in June 2010 (at the last of Plaintiff's series of visits in 2010), and a third given upon the examination of Plaintiff that Dr. Drukman performed shortly after the second administrative hearing, in 2014. (*Id.* at 404.) As set out above, the ALJ accorded all of those opinions only "little weight," while, in contrast, he gave "considerable weight" and "the most weight" to the opinions of consulting examiners Drs. Eyassu and Thukral, respectively. This represented a violation of the treating physician rule for at least the following reasons:

First, as Plaintiff points out, "[t]he Second Circuit has specifically cautioned ALJs that they should *not* rely heavily on the findings of consultative physicians after a single

examination," and has held that "[t]his is especially true when the views of a non-treating physician are solicited solely for the purposes of the disability proceeding itself." (Pl. Mem., at 34 (citing *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013), *citing Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 626 (S.D.N.Y. 2006), *citing Schisler v. Sullivan*, 3 F.3d 563, 567-68 (2d Cir. 1993)).) In contrast to Dr. Drukman's substantial treating relationship with Plaintiff, the consultative physicians, Drs. Eyassu and Thukral, each examined Plaintiff only once, a factor the ALJ did not expressly take into account.

Second, Dr. Drukman had a relevant medical specialty (physical medicine and rehabilitation) (Pl. Mem., Ex. A; *see also supra*, at n.3)), another factor which the ALJ seemingly failed to take into account in assigning far less weight to Dr. Drukman's opinions than to those of the two consultants, both of whom, it seems, were internists (*see* R. at 268, 586). In addition to considering the length, nature, and extent of each physician's relationship with Plaintiff, the ALJ was required to give explicit consideration to the doctors' respective areas of specialization, in weighing their competing medical opinions, *see* 20 C.F.R. § 404.1527(c)(2)-(5), but the ALJ's decision does not reflect such consideration.

Third, the ALJ's only stated reason for assigning "little weight" to Dr. Drukman's January 13, 2010 assessment – *i.e.*, that "it was made only days after [Plaintiff] sustained her injuries" (R. at 404) – is inaccurate on its face, as that assessment was *not* made on Plaintiff's first visit to Dr. Drukman, but rather on a later visit, about a month and a half after the accident.

Fourth, the ALJ's only stated reason for assigning "little weight" to Dr. Drukman's June 2010 assessment was that "it was made within 12 months of [Plaintiff's] injuries." (*Id.*) While it is true that Plaintiff needed to establish a period of disability lasting at least 12 months, this is not a valid basis for rejecting, nearly entirely, a treater's opinion. Furthermore, if, as suggested by

his rejection of Dr. Drukman's earlier opinion, the ALJ had concerns about crediting a physical assessment occurring too close in time to the accident, then he should have at least assigned more weight to an assessment occurring more than six months after that event, and after a six-month course of physical therapy and other treatment, as such an assessment would presumably have been more telling as to whether any physical injuries that Plaintiff suffered in the accident had lasting consequences.  Moreover, Dr. Drukman's June 2010 opinion could have been read by the ALJ in conjunction with Dr. Nesen's report of October 11, 2010.  While the Record reflects only a single visit by Plaintiff to Dr. Nesen for pain management, Dr. Nesen's medical findings were largely consistent with those recorded by Dr. Drukman in June, and further suggested the lasting nature of Plaintiff's symptoms, through a period of at least 10-and-a-half months from the date of her accident.

Fifth, one of the ALJ's stated reasons for discounting Dr. Drukman's 2014 opinion was that it was purportedly "based more on [Plaintiff's] subjective complaints than the medical history and objective findings" (*id.*), when the report itself reveals otherwise.  In that opinion, Dr. Drukman detailed numerous clinical findings, including Plaintiff's diminished grip strength and range of motion restrictions in her right wrist, in several modes (flexion, extension, ulnar deviation, and radial deviation), each of which the doctor quantified.  (*Id*. at 635-36.)  Moreover, even apart from Plaintiff's wrist, Dr. Drukman apparently examined and tested Plaintiff's neck and back, using several identified testing protocols, and recorded a number of abnormal test results and positive orthopedic findings for each.  (*See id*. at 635 (regarding Plaintiff's neck, recording restricted ranges of motion, and findings of "[t]enderness in the lower cervical interspinous [processes]," as well as "[p]ositive foraminal compression, foraminal distraction, Jackson's, Spurling's and Soto-Holl on the right"); 636 (regarding lumbar area of Plaintiff's

back, recording restricted ranges of motion, and findings of "[p]ositive Lasègue/SLP at 60˚ on the right" and "[f]lattened lumbar lordosis, Kemp's, Bragard's positive on the right").[28])

The only other reason given by the ALJ for assigning Dr. Drukman's 2014 opinion "little weight" was that, with respect to Plaintiff's wrist, that opinion failed to take into account the doctor's own earlier records, which, according to the ALJ, had shown considerable improvement of Plaintiff's condition. (*Id*. at 404.) It is not necessarily true, however, that an initial improvement achieved, not only after surgery, but after weeks of physical therapy, will be lasting in the absence of continued therapy. Additionally, it is again worth noting that, in 2014, Dr. Drukman did not simply rely on Plaintiff's subjective reports of wrist pain; rather, as she had done consistently in her prior examinations, Dr. Drukman conducted several range-of-motion tests on Plaintiff's wrist, as well as a dynamometric assessment of Plaintiff's grip strength, and indicated precise readings for each test performed. (*See id*. at 635-36.) In any event, even if substantial evidence in the Record provided reason to doubt Dr. Drukman's stated results of her 2014 testing of Plaintiff's wrist mobility and grip strength, this would not have justified the ALJ's discounting of all remaining aspects of Dr. Drukman's detailed report.

Under the circumstances, the ALJ's purported reasons for discounting Dr. Drukman's referenced opinions cannot objectively be viewed as the type of "good reasons" that the regulations and case law require. *See* 20 C.F.R. § 404.1502; *Halloran*, 362 F.3d at 33 (holding lack of stated "good reasons" for discounting treating physician's opinion to be ground for remand).

---

[28] The various tests referred to here by Dr. Drukman are examination techniques used to assess, *inter alia*, a patient's range of motion in the neck and back and to determine if there is nerve compression. (*See, e.g*., http://medical-dictionary.thefreedictionary.com/Spurling+test; http://medical-dictionary.thefreedictionary.com/Bragard+sign.)

Finally, it appears that the ALJ's stated reason for assigning the "most weight" to the opinion provided by Dr. Thukral (after his single consultative examination of Plaintiff in 2014) may have been misplaced. The reason given by the ALJ for this was that Dr. Thukral was supposedly "familiar with the expanded medical record." (*Id.* at 404.) Yet, as pointed out by Plaintiff in her motion (*see* Pl. Mem, at 22), Dr. Thukral's familiarity with her full medical record was not at all evident from his written opinion, as Dr. Thukral did not note that he reviewed *any* of Plaintiff's medical records, including reports of her relevant MRIs or other diagnostic studies (*see generally* R. at 583-86). Further, to the extent Dr. Thukral performed tests for Plaintiff's grip strength, range of motion, and postural restrictions (finding her to have virtually no limitations), this Court notes that, not only did Dr. Thukral apparently lack Dr. Drukman's specialization, but, unlike Dr. Drukman, he did not record any particular tests he performed, or any particular test results. (*See generally id.*)

This Court does take note of the relative lack of medical evidence in the Record beyond the period of Dr. Drukman's initial treatment of Plaintiff, in 2010, and further notes that Plaintiff bears the burden of establishing before the SSA that she was disabled for a continuous period of 12 months. Nonetheless, if the ALJ had given controlling weight to the various opinions of Dr. Drukman, or even if he had only given her opinions more weight than that of the consulting examiners, he could have found that Plaintiff had satisfied her burden. For example, by assigning Dr. Drukman's 2010 opinions greater weight, the ALJ could have reasonably gone on to conclude that the neck and back impairments documented by Dr. Drukman for the first several months following Plaintiff's November 28, 2009 accident were not resolved by the time Plaintiff sought pain-management care from Dr. Nesen in October 2010 (almost 11 months from the date of the accident), or by the time she sought similar care from the treaters at the Ryan Center in

July or early August 2011 (approximately one year and eight months after the accident). As detailed above, Dr. Nesen made clinical findings of, *inter alia*, muscle spasms in Plaintiff's neck and back (*id.* at 382), decreased ranges of motion in both (*id.*), and cervical and lumbosacral facet arthropathy (*id.* at 383); advised Plaintiff to continue medications (including pain medication and a muscle relaxant) and physical therapy (*id*); and recommended "nerve block" injection therapy (*id.*). At the Ryan Center, Dr. Cha similarly referred Plaintiff for further physical therapy, and prescribed her both a muscle relaxant and a narcotic painkiller. (*Id.* at 602, 606.) Indeed, if the ALJ had given Dr. Drukman's 2014 opinion greater weight – even just with respect to Plaintiff's spinal conditions – then the ALJ would have had a basis in the Record reasonably to conclude that Plaintiff's limitations, with which Dr. Drukman was quite familiar in 2010, had not resolved even past December 31, 2013, the last date that Plaintiff was insured for SSDI coverage.

Accordingly, as, on the parties' first, voluntary remand, the ALJ did not comply with the treating physician rule, and as the proper application of that rule could result in a different outcome, I recommend that this matter again be remanded to the SSA, with directions to the ALJ to comply with the treating physician rule in weighing the medical opinion evidence.

### 2. Failure To Make a Proper Credibility Assessment

In light of Plaintiff's lack of medical treatment between 2011 and 2014, and the fact that Plaintiff's wrist impairment appeared to improve over time following her surgery, the ALJ concluded that the testimony given by Plaintiff in the second hearing "regarding the pain and functional limitations she experience[d] due to wrist pain," including her testimony regarding her reliance on her 11-year-old daughter to assist her with bathing and dressing, were "not at all credible." (*Id.* at 403.) In addition, citing the supposed "paucity of treatment, the rather negative

findings reported on physical examinations, the non-use of prescribed pain medication, [and] [Plaintiff's] activities," the ALJ found that, in general, the objective evidence did not substantiate Plaintiff's subjective statements "regarding the severity of her symptoms or degree of physical limitations." (*Id.* at 403-04.) In discrediting Plaintiff's testimony, however, the ALJ made several legal errors, which also warrant remand.

As a threshold matter, the ALJ was not tasked with determining whether Plaintiff was disabled as of the date of the second hearing (in July 2014), as that date was already outside the period of her eligibility for SSDI coverage. Rather, as emphasized above, he was tasked with determining whether there was any continuous, 12-month period from November 28, 2009 (Plaintiff's alleged onset date) to December 31, 2013 (her date last insured), in which she was unable to work. Accordingly, the question of whether Plaintiff's allegedly disabling conditions had improved by July 2014 was immaterial. Similarly, her lack of treatment after November 2011 (when the Record last shows her having visited Dr. Cha) is of limited relevance. Even apart from the questions of whether Plaintiff had reached maximum improvement or could afford additional treatment, an inquiry would have been needed as to whether she was sufficiently impaired so as to have been unable to work for at least one year during the period at issue, and that would have included the time when she *was* under medical care.

On this point, this Court notes that, in her *first* administrative hearing, held in August 2011, Plaintiff testified to being right-handed (*id.* at 50), and to having a number of difficulties, as of that time, using her right hand and wrist. These difficulties, as described, included writing, grasping, and picking up objects, such as a cup for drinking. (*Id.* at 50-52.) Plaintiff also testified in the first hearing that she could not then perform her relevant past work as a cashier because, as of that time, she was "unable to stand, sit for a long period of time, or walk." (*Id.* at

44; *see also id.* at 51 (testifying that she could only sit or stand for 10 to 15 minutes without pain).) At the time of that hearing, Plaintiff was wearing a back brace (*see id*. at 47), and, apart from her wrist, she testified to having pain in her neck, her lower-right back, and her right upper leg (*id*. at 45). As to her resulting limitations, she testified that she needed assistance with dressing (*id*. at 50), that she could not bend to pick up a piece of paper from the floor (*id*. at 52), that she could not push or pull a shopping cart (*id*.), and that she could only lift and carry about five pounds (*id*.). She also testified to having undergone a substantial course of physical therapy – three times a week, from December 3, 2009 to June 2010 (when there is at least some suggestion in the Record that her insurance expired) (*see id*. at 46-47, 38; *see also supra*, at n.9), and to receiving pain medication at the Ryan Center contemporaneously with the hearing (*id*. at 48-49), although she testified that the prescription medication only helped "[a] little" to ease her pain (*id.* at 47).

Not only did the ALJ fail, in his 2014 decision, to address whether the objective medical evidence that existed as of the August 2011 hearing date (including, *inter alia*, Plaintiff's MRIs, Dr. Drukman's numerous positive orthopedic findings, and Dr. Nesen's similar findings) revealed at least spinal conditions that reasonably could have been expected to produce the symptoms that Plaintiff described at that time, but the ALJ mischaracterized the evidence that he did consider. For example, the ALJ stated that, "[d]uring most of the time since June 2010, [Plaintiff] ha[d] used only over-the-counter pain medication" (*id*. at 404), when the reports of Dr. Eyassu (from August 2010), Dr. Nesen (from October 2010), and Dr. Cha (from August and November 2011) variously recorded Plaintiff's medications as including hydrocodone, Tylenol with codeine, and Tramadol (*see id.* at 265, 382, 598, 604) – all of which are narcotic painkillers. In any event, although the "type, dosage, effectiveness, and side effects" of a claimant's

medication is a factor that may legitimately influence a credibility determination (*see* C.F.R.

§ 404.1529(c)(3)(i)-(vii)), an ALJ is not permitted to conclude that the severity of a claimant's

impairments, or her credibility in describing those impairments, correlates with her non-use of

prescription medication, when there is evidence in the record that the claimant's doctors may

have opted to utilize a more conservative approach.  *See Shaw*, 221 F.3d at 134-35 (holding that

the ALJ had improperly characterized conservative treatment, which did not include prescription

drugs, as substantial evidence that plaintiff was not physically disabled during the relevant

period); *Garcia v. Colvin*, No. 12-CV-2140 (NGG), 2014 WL 119433, at *10 (E.D.N.Y. Jan. 10,

2014) (ALJ erred in discounting plaintiff's credibility in part because her "medications dosage

and frequency" was "not consistent with pain levels so severe that [they] preclude[d] work"

(internal quotation marks omitted)).

In addition, to the extent the ALJ found that Plaintiff did not continue a rigorous course

of treatment after June 2010, he did not give any explicit consideration to Plaintiff's explanations

for this.  Although SSR 96-7p[29] provided that a claimant's "statements may be less credible if

the level or frequency of treatment is inconsistent with the level of complaints, or if the medical

reports or records show that the individual is not following the treatment as prescribed," it also

directed an ALJ not to make an adverse credibility determination based on a lack of medical

treatment "without first considering any explanations that the individual may provide, or other

information in the case record, that may explain infrequent or irregular medical visits or failure

to seek medical treatment."  SSR 96-7p, 1996 WL 374186, at *7 (S.S.A. July 2, 1996).  Here,

Dr. Drukman explained in her 2014 report that, "[d]ue to no significant improvement" after more

than six months of treatment, she referred Plaintiff "for pain management" after June 2010.  (R.

---

[29] *See supra*, at n.24.

at 634.)  The Record further suggests that, although Plaintiff followed up by seeing Dr. Nesen, a pain-management specialist, Plaintiff's no-fault insurance coverage expired around that time, leaving her unable to afford further treatment.  (*See id.* at 38, 437, 599.)  In fact, Plaintiff's attorney informed the ALJ that, even after her March 2010 examination by Dr. Gallina, the automotive insurer had declined to approve Plaintiff's request for spinal surgery, and "short of that, [Plaintiff] [could not] afford surgery."  (*Id.* at 429-30.)  Plaintiff's eventual visits to the Ryan Center in 2011, for pain medication, may only have been made possible by Plaintiff's later receipt of Medicaid.  (*See id*. at 38.)  The Record thus provides alternative explanations for the decline in Plaintiff's medical visits after 2010, other than the ALJ's deduction that Plaintiff "ha[d] attempted to portray herself as a lot more impaired than she actually [was]."  (*Id.* at 404.)

Finally, this Court notes that the fact that Plaintiff cared for her two younger children apparently contributed significantly to the ALJ's negative credibility determination:

> [Plaintiff] maintains a household with two very young children (now age 11 and 1 1/2 years of age).  She therefore takes care of a very young child, and has been doing so since late 2012. . . . I note that [Plaintiff] testified that she gets assistance with childcare from her two older children (ages 22 and 20), but these children do not live with [Plaintiff], and are therefore not available all of the time. Her 11-year-old is also at school for a good portion of the day.

(*Id.* at 404 (relying on Plaintiff's testimony at the 2014 hearing).)  Even apart from the fact that, here, the ALJ again seemed to be focusing only on the period "since late 2012" and not the entire period under review, parenting does not preclude a finding of disability, especially in the presence of evidence that the claimant received assistance with childcare.  Plaintiff's testimony, reports to her physicians, and written statements to the SSA repeatedly made clear that, over the period at issue, she had received help from her family and others with childcare, as well as with household chores and errands (*see, e.g.*, *id.* at 128, 180, 202, 265-66, 425, 431, 584, 634), evidence that the ALJ largely disregarded in assessing her credibility.

For all of these reasons, I recommend that, upon remand, the ALJ be directed to reassess Plaintiff's credibility, in light of the entire time period under consideration and the other issues identified herein.

### 3.    Improper Determination of Plaintiff's RFC

Plaintiff also contends that the ALJ erred in determining her RFC, to the extent he acknowledged that she had certain physical limitations, but then determined that she had the capacity to perform her past work as a cashier, despite the fact that, according to Plaintiff, the acknowledged limitations would have precluded her from performing that past work.  (*See* Pl. Mem., at 37.)  Plaintiff additionally argues that it was error for the ALJ to make this determination that without first obtaining testimony from a vocational expert.  (*See id*., at 38.)  In large measure, these arguments are also persuasive.  Furthermore, to the extent the ALJ looked to Plaintiff's condition as of the date of the second hearing so as to determine her RFC, and concluded that, by that date, she had shown significant medical improvement, he necessarily failed to address the question of whether there was any earlier 12-month period during her period of eligibility when she lacked the functional ability to work.

At Step Four of the sequential evaluation process, an ALJ is charged with ascertaining a claimant's RFC, so as to determine whether the claimant can perform her past relevant work. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(5)(i).  A claimant's RFC represents the most the claimant can still do despite her limitations, 20 C.F.R. § 404.1545(a)(1), and it must be evaluated based on all the relevant evidence in the case record, *id.*  For a claimant with multiple impairments, all medically determinable impairments, including those impairments that are not "severe," are to be considered in the ALJ's assessment of the claimant's RFC.  *Id.* § 404.1545(a)(2).  Further, RFC determinations are to be assessed on the basis of all of the relevant medical and other evidence in

the case record, including both statements about what the claimant can still do that have been

provided by medical sources (whether or not those statements are based on formal medical

examinations) and descriptions and observations by the claimant, her family, neighbors, friends,

or other persons of the claimant's limitations from her impairments, including limitations that

result from symptoms such as pain. *Id.* § 404.1545(a)(3). If the ALJ determines that the

claimant's RFC precludes her from doing her past relevant work, then the ALJ must go on to use

the same RFC determination at Step Five of the sequential evaluation. *Id.* § 404.1545(a)(5)(ii).

When assessing a claimant's physical abilities, the ALJ should first assess the nature and

extent of the claimant's physical limitations, and then determine the claimant's RFC for work

activity on a regular and continuing basis. *Id.* § 404.1545(b). The claimant's limited ability to

sit, stand, walk, lift, carry, push, pull, or do other physical functions (including reaching,

handling, stooping, or crouching) may reduce the claimant's ability to do past work and other

work. *Id.* If a claimant has a severe impairment or impairments, but her symptoms, signs, and

laboratory findings do not meet or medically equal those of a listed impairment in Appendix 1 of

Subpart P, then the ALJ should consider the limiting effects of all the claimant's impairments,

including those that are not severe, in determining the claimant's RFC. *Id.* § 404.1545(e).

In this case, the ALJ assessed Plaintiff's RFC as enabling her to perform light work,

"except [that] she [was] limited to no more than frequent (one-third to two thirds of the workday)

twisting or turning objects with the right arm and wrist." (R. at 398.) Then, as noted above, the

ALJ determined that Plaintiff could perform her past relevant work as a cashier.

The DOT Listing for the job of "cashier-wrapper," which the ALJ relied on in

considering Plaintiff's past relevant work, reads as follows:

> Operates cash register to compute and record total sale and wraps
> merchandise for customers in department, variety, and specialty

stores:  Receives sales slip, money, and merchandise from
salesperson or customer.  Records amount of sale on cash register
and makes change.  Obtains credit authorization on charge
purchases in excess of floor limit from designated official, using
telephone or pneumatic tube carrier.  Inspects merchandise prior to
wrapping to see that it is in satisfactory condition and verifies sales
slip with price tickets on merchandise.  Places merchandise in bags
or boxes and gives change and packages to selling personnel.
Wraps packages for shipment and routes to delivery department.
Balances cash received with cash sales daily.  May gift wrap
merchandise.  . . .[30]

DOT Listing 211.462-018.

This position is classified as "light" work, which involves lifting of no more than

20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds.

20 C.F.R. § 404.1567(b).  Further, "a job is in this category when it requires a good deal of

walking or standing, or when it involves sitting most of the time with some pushing and pulling

of arm or leg controls."  *Id*.  For someone "[t]o be considered capable of performing a full or

wide range of light work, [the worker] must have the ability to do substantially all of these

activities."  *Id*.  The SSA's Program Policy Statement  (SSR 83-10) explains that, under the

applicable regulation, "[s]ince frequent lifting or carrying requires being on one's feet up to two-

thirds of a workday, the full range of light work requires standing or walking, off and on, for a

total of approximately 6 hours of an 8-hour workday."  SSR 83-10, 1983 WL 31251, at *6

(S.S.A. 1983).  The Program Policy Statement also explains that "[m]any unskilled light jobs are

performed primarily in one location, with the ability to stand being more critical than the ability

to walk."  *Id*.  Such jobs are also understood to "require [the] use of arms and hands to grasp and

---

[30] U.S. Dep't of Labor, Emp't & Training Admin., Dictionary of Occupational
Titles § 2 Clerical and Sales Occupations (4th ed., rev. 1991).

to hold and turn objects," although "they generally do not require use of the fingers for fine activities to the extent required in much sedentary work."  *Id.*

Plaintiff argues that a review of the particular job listing for this position "plainly indicates that an individual must be capable of fine manual dexterity in order to perform the job" (Pl. Mem., at 31), and, indeed, must be able "to perform tasks necessitating fine manual dexterity on a constant and continuous basis" (Pl. Reply Mem., at 6).  Thus, Plaintiff contends that, by finding that Plaintiff was restricted in her ability to twist and turn objects with her right hand, and then finding that Plaintiff could perform the "cashier-wrapper job," the ALJ issued a decision that was internally inconsistent.  (*See* Pl. Mem., at 37-38 ("If [Plaintiff's] capacity to perform her past work as a cashier is compromised as the ALJ found, then she obviously *cannot* perform the full range of cashier work as specified in the DOT listing" (emphasis in original)).)  Defendant, in contrast, argues that "[P]laintiff's non-exertional limitations for frequent use of [the] right arm and wrist to twist or turn objects do not exceed the demands of this job as it is defined by the DOT and as it is generally performed."  (Def. Opp., at 25.)

While, in light of the explanation in SSR 83-10 that light work often does not require the same fine finger activity as sedentary jobs, Plaintiff may be overstating her argument, it is at least true that the ALJ did not explain how his assessment of Plaintiff's limitations in her ability to twist or turn objects with her right hand accorded with his finding that she was able to perform her past work.  It is also true that, absent testimony from a vocational expert, the ALJ was not permitted to conclude that Plaintiff could perform "light work," if she were at all restricted in her ability to grasp, hold, and "turn" objects – abilities needed for that classification of work.

Further, by misapplying the treating physician rule as discussed above, the ALJ improperly discounted the consistent, repeated opinions of Dr. Drukman, during and after the

eligibility period, that Plaintiff was unable to stand for prolonged periods and had additional

limitations in, at a minimum, reaching, bending, and lifting. (*See, e.g.*, R. at 185, 190, 206, 637.)

Had the ALJ properly applied the rules for weighing opinion evidence, he may have concluded

that Plaintiff had certain postural and exertional limitations – at least in the first year following

her accident – that would have precluded her from performing certain tasks. Even if those

limitations were not severe or necessarily disabling, they would have needed to have been

factored into the ALJ's analysis of Plaintiff's RFC, and of her ability to perform her relevant past

work, as that work was typically performed.[31]

Similarly, in engaging in a flawed assessment of Plaintiff's credibility, it appears that the

ALJ may have failed to give sufficient consideration to Plaintiff's testimony regarding the nature

of her past cashier's job, the way it was actually performed, and the nature of the limitations that,

in her view, precluded her from performing that past work. In the 2011 hearing, Plaintiff

testified that she could not perform her past work as a cashier because she was "unable to stand,

sit for a long period of time, or walk." (*Id.* at 44.) More specifically, she testified that she could

only sit or stand for 10 to 15 minutes, without starting to feel pain. (*Id.* at 51.[32]) This was

entirely consistent with Plaintiff's repeated complaints to Dr. Drukman over the course of her

---

[31] On this point, this Court also notes that the report of consulting physician Dr. Eyassu, in August 2010 (as well as the RFC assessment of Disability Analyst Danielson, in September 2010), similarly found that Plaintiff had certain limitations in bending, lifting, pulling, and pushing (*see id.* at 267-68, 274), but the ALJ discussed none of those findings, with specificity, in his conclusory RFC determination. In fact, while the ALJ stated that he gave "considerable weight to the conclusions of Dr. Eyassu," that Plaintiff "should avoid heavy lifting and sustained pushing and pulling, and that there was moderate limitation on activity that would require repetitive bending, excessive neck movement, or turning and twisting" – all of which the ALJ found was "consistent with the objective evidence" (*id.* at 404) – the ALJ did not proceed to discuss these limitations in his RFC analysis, other than, perhaps, to suggest implicitly that a restriction to "light work" would be sufficient to address them (*see id.* at 405).

[32] At the second hearing, in 2014, Plaintiff testified that she could only sit for about five or 10 minutes, and only stand for about five minutes. (*Id.* at 430.)

treatment,[33] and was supported by objective medical evidence, including X-ray and MRI imaging tests.[34]  Given the criteria set out above for light work (and the SSA's explanation that the ability to stand may be most critical to this type of work), the ALJ could not have determined, absent guidance from a vocational expert, that Plaintiff could not perform her relevant past work, if he had merely credited her testimony that she could not stand for any sustained period of time.

Additionally, Plaintiff testified that her job as a cashier had required her to carry daily supplies and merchandise (*id*. at 52-53), and had required frequent lifting and carrying of 10 to 20 pounds (*id*. at 53).  At the second hearing, Plaintiff added that, when she had been placed in the "shipping department" at her prior job, she had frequently been required to lift and carry multiple garments at a time, together weighing around 20 to 25 pounds.  (*Id.* at 433-34.)  Yet even the lesser weight requirements of the job that she described in her 2011 testimony would have exceeded the demands of "light" exertional work, which, as noted above, only allows for the frequent lifting and carrying of up to 10 pounds.  Plaintiff also testified that, as of the date of her testimony in 2011, she was only able to lift and carry about five pounds (*id*. at 52; *see also id*. at 430 (same testimony at 2014 hearing)); had the ALJ credited that testimony, his RFC determination again could not have stood, without support from a vocational expert.

---

[33] *See id*. at 180 (Dec. 2009 Drukman report, indicating complaint of inability to sit for longer than 30 minutes or stand longer than 10 to 15 minutes); *id.* at 186 (Jan. 2010 Drukman report, indicating complaint of pain interfering with prolonged sitting and standing); *id.* at 202 (June 2010 Drukman report, indicating complaint of back pain on sitting, and on standing longer than 10 minutes); *id.* at 634 (July 2014 Drukman report, indicating complaint of symptoms interfering with sitting for longer than 10 to 15 minutes or standing longer than five minutes).

[34] As set out above, these imaging tests showed degenerative disc disease at L5-S1 (*id.* at 304); retrolisthesis of C4 on C5 (*id.* at 303); broad-based disc bulge at L4-L5, with extension of the disc into the neural foramen bilaterally (*id.* at 207); and focal central herniation at C6-C7, creating impingement on the neural canal (*id.* at 208).

This Court acknowledges that, had the ALJ properly weighed the opinion evidence and assessed Plaintiff's credibility, he may still have found that Plaintiff was capable of performing her relevant past work during the period at issue. Moreover, even if he had determined that Plaintiff could not have performed her past job as a cashier for any continuous 12-month period within her eligibility period, this does not mean that he should necessarily have determined that Plaintiff was totally disabled. At that point, however, the ALJ would have been required to advance to Step Five of the sequential evaluation, at which time the burden would have shifted to the Commissioner to demonstrate that Plaintiff was capable of performing some other work in the national economy. (*See* Pl. Mem., at 38 (citing *Zabala v. Astrue*, 595 F. 3d 402, 410 (2d Cir. 2010).) At that point, if the ALJ had found that Plaintiff had any non-exertional impairments (such as any restrictions in the ability to bend or stoop, or to manipulate objects), then, at Step Five, the ALJ would have been required to seek testimony from a vocational expert, before making a final disability determination.

Given the ALJ's violation of the treating physician rule and his improper credibility assessment, both of which appear to have impacted his determination of Plaintiff's RFC, this Court cannot conclude that substantial evidence in the Record supports the ALJ's RFC determination. Upon remand, I recommend that the ALJ be directed to re-evaluate Plaintiff's RFC, in light of any modified weighing of the opinion evidence and reassessment of Plaintiff's credibility.

## **CONCLUSION**

For all of the foregoing reasons, I respectfully recommend that Plaintiff's motion for judgment on the pleadings (Dkt. 32) be granted, that Defendant's cross-motion for judgment on the pleadings (Dkt. 34) be denied, and that, on Plaintiff's motion, this case be remanded for

further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).  I further recommend that, upon remand, the ALJ be directed:

> (1)  to give controlling weight to the several medical opinions of Dr. Drukman, or to state good reasons for not doing so;
>
> (2)  to reassess Plaintiff's credibility, particularly with respect to whether her claimed impairments were potentially disabling for any continuous 12-month period from November 28, 2009 to December 31, 2013;
>
> (3)  to re-evaluate Plaintiff's RFC, in light of any modified determinations as to the weight to be accorded to Dr. Drukman's opinions and as to the credibility of Plaintiff's testimony; and
>
> (4)  to proceed to Step Five of the sequential evaluation, if dictated by any revised determination at Step Four, and, upon any findings of non-exertional limitations, to secure the testimony of a vocational expert before making a revised disability determination.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Ronnie Abrams, United States Courthouse, 40 Foley Sq., Room 2203, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Abrams.  FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v.*

*Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d

Cir. 1983).

Dated:  New York, New York
      August 31, 2017

                            Respectfully submitted,

                            DEBRA FREEMAN
                            United States Magistrate Judge

<u>Copies to</u>:

Hon. Ronnie Abrams, U.S.D.J.

All counsel (via ECF)